1
2
3
4
5
6
7
8

**UNITED STATES DISTRICT COURT**

9

**SOUTHERN DISTRICT OF CALIFORNIA**

10

KEVIN CHARLES COLE,

Civil No.        09-0653 IEG (POR)

11

Petitioner,

**REPORT AND RECOMMENDATION**
**RE: DENIAL OF PETITION FOR WRIT**
**OF HABEAS CORPUS**

12

vs.

13

MATTHEW CATE, Secretary, et al.,

Respondents.

14

15    **I.      INTRODUCTION**

16          Kevin Charles Cole (Cole) is a California prisoner serving a sentence of seventeen years in

17    prison.  In San Diego Superior Court case number SCD169061, Cole was convicted of fourteen counts

18    of making a false statement in connection with the sale of a security, fourteen counts of being a

19    broker/dealer transacting a security without a certificate, two counts of elder theft and one count of

20    residential burglary.  (Lodgment No. 1, vol. 4 at 0723-91.)  The jury also found true two enhancements

21    related to the amount of money Cole stole.  (*Id.* at 0793-96.)

22          Cole has filed a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 (Pet.)

23    challenging his convictions.  In his Petition, he contends: (1) he was denied his Sixth Amendment right

24    to represent himself; (2) as to three of the broker/dealer counts, there was insufficient evidence presented

25    to establish he knew he was selling a security; (3) as to eleven of the broker/dealer counts, there was

26    insufficient evidence that he was a broker/dealer; (4) there was insufficient evidence to establish he had

27    the intent to permanently deprive the victims of their money as to the elder theft and burglary

28    / / /

1  convictions; and (5) as to eight of the false statement counts, there was insufficient evidence presented

2  to establish he knowingly made false statements.  (Pet. at 7-14.[1])

3       This Court has reviewed the Petition, Respondents' Answer, the Traverse, and all supporting

4  documents submitted by the parties.  After a thorough review of the record, the Court finds that

5  Petitioner is not entitled to the relief requested and **RECOMMENDS** that the Petition be **DENIED**.

6  **II.    FACTUAL BACKGROUND**

7       This Court gives deference to state court findings of fact and presumes them to be correct;

8  Petitioner may rebut the presumption of correctness, but only by clear and convincing evidence.  28

9  U.S.C.A. § 2254(e)(1) (West 2006); *see also Parke v. Raley*, 506 U.S. 20, 35-36 (1992) (holding

10  findings of historical fact, including inferences properly drawn from these facts, are entitled to statutory

11  presumption of correctness).  The following facts are taken from the California Court of Appeal's

12  opinion denying Cole's direct appeal of his conviction.  Because of the numerous charges, the facts are

13  quite lengthy.

14       *Background and Timeline*

15       In the 1990's, Eric Scott Schoeller, a paralegal and document preparer, helped
16  elderly clients establish living trusts.  Attorney Frank Mango proposed that he perform
   free trust reviews for Schoeller's clients with the understanding that Mango might
   attempt to sell them investments.  Schoeller agreed and gave Mango his client list with
17  approximately 2,100 names.  Under the proposal, Schoeller was to receive 1 percent of
   the sales commissions that Mango and his agents received.

18

19       Cole, a licensed life insurance salesman, worked for Mango.  From 1999 to 2001,
   Cole reviewed the living trusts of some of Schoeller's clients — Ethel Correia, Leonora
20  High, Marian Goins, and Elvira and Feliciano DaSilveira — and sold them secured notes
   in Carlmont Capital Special Purpose Corporation II (Carlmont Capital).  Carlmont
   Capital invested in medical receivables in the small physician group segment of the
21  health industry. [footnote omitted].  None of these individuals lost money by investing
   in Carlmont Capital.  However, these clients lost considerable sums when Cole, and later
22  Robles, revisited them and sold them investments in other corporations or in their own
   businesses.  Cole and Robles sold these same high-risk investments to individuals who
23  responded to newspaper advertisements they had placed or who were referred to them
   through word of mouth.

24
       On September 10, 2000, advertisements began running in the San Diego
25  Union-Tribune for an entity identified as Pathway Financial, offering a double-digit
   return.  Five months later, on February 8, 2001, articles of organization for Pathway
26  Financial, LLC, were filed with the Nevada Secretary of State.  Cole and Robles were
   listed as managers of Pathway Financial.  On October 20, 2000, Cole and Robles

27

28  ────────────────────

   [1]   For ease of reference, the Court will use the page numbers assigned to the petition by the Court's
   electronic filing system.

incorporated Pathway Strategies in Nevada and listed themselves as directors in the articles of incorporation. Cole and Robles used Pathway Financial, the partnership, for advertising and in correspondence; they used Pathway Strategies, the corporate entity, to issue the promissory notes.

Initially, Pathway Strategies promoted direct investments in Alpha Telcom/American Telecommunications (Alpha Telcom) which operated and maintained pay telephones in rural areas of the United States and sold these telephones to investors across the country. Alpha Telcom represented to its investors that their investments were guaranteed by its "buyback" insurance policy. [footnote omitted]. Alpha Telcom originally paid Robles a 12 percent commission for selling the telephones; this was later increased to 17 percent and then to 18 percent.

In November 2000, the California Department of Corporations (DOC) wrote to Cole informing him that Carlmont Capital, one of the investments he had been selling, may be a security within the meaning of the Corporations Code and that if it were, he did not have the requisite broker-dealer license. The letter asked Cole for further information. On the same day, DOC sent a similar letter to Robles. On February 7, 2001, the DOC issued Cole desist and refrain orders to stop selling investments in Carlmont Capital because it was not qualified as a security and to stop acting as a broker-dealer selling securities. [footnoted omitted].

At or about this same time, in the autumn of 2000, Pathway Strategies adopted a new business plan. Instead of selling direct investments in other companies, it offered its own promissory notes at double-digit returns to its clients. Cole and Robles represented that Pathway Strategies would lend these proceeds to Alpha Telcom and other companies that needed immediate cash and offered an interest rate higher than the promissory notes issued by Pathway Strategies. Pathway Strategies offered its investors a promised return and kept, as corporate profit, the interest it received that exceeded this promised return.

Some of these representations proved false, and Cole and Robles did not invest the investors' money as they indicated they would. By the summer of 2001, Pathway Strategies' investors were no longer receiving their interest payments. At the end of August 2001, Alpha Telcom filed for bankruptcy. Cole and Robles's customers who had invested in Alpha Telcom — either directly or through Pathway Strategies promissory notes — did not receive their principal back. In February 2002, the U.S. District Court in Oregon found Alpha Telcom's payphone program was an investment contract and constituted a security. (*Securities and Exchange Commission v. Alpha Telcom, Inc.* (2002) 187 F.Supp.2d 1250, 1258.) [footnoted omitted].

Another investment promoted by Pathway Strategies during this time period was NatureWell, a late stage start-up company that manufactured health care products. On June 28, 2001, Pathway Strategies invested $75,000 in NatureWell stock, and another $50,000 on July 30. NatureWell's subscription agreement for purchasing shares stated there was a high degree of risk and there was unlikely to be a market for the shares for a substantial period of time. In the summer of 2001, NatureWell's stock was selling for between 30 cents and 60 cents on the over-the-counter market. By February 2003, NatureWell stock was selling for between 2 cents and 4 cents. At the time of the trial, the stock was selling for about six-tenths of 1 cent. The chief financial officer of NatureWell testified that NatureWell was a risky investment in 2001.

Pathway Strategies also promoted investments in Tierra Telcom, Inc., which had developed "a proprietary black box that allowed voice-over Internet procedures." Tierra Telcom was a "restart-up" company that had previously failed and in the spring of 2001

was in dire financial straits.  In July 2001, Pathway Strategies invested $125,000 in short-term Tierra Telecom promissory notes.

Between October 16, 2001, and February 4, 2002, articles of organization for Pathway Development, a limited liability company, were filed in Nevada; the last advertisement for Pathway Financial appeared in the San Diego Union-Tribune; and articles of incorporation were filed in Nevada for Pathway Management Group, Inc., listing Cole as secretary and Robles as vice president.

In May 2002, Robles and Cole terminated their business relationship.  On May 17, Pathway Strategies' list of officers was amended to list Robles as the sole owner.

Cole continued to do business through Investment Revolution Strategies, Inc. (Investment Revolution Strategies) and Faith Holdings, Inc. (Faith Holdings).  Both were Nevada corporations that were incorporated in 1996 and 1998, respectively.

During the summer of 2002, Faith Holdings attempted to invest in a company installing electronic "point of sale" terminals for swiping credit cards used as payment in retail stores.  Cole was raising money for this investment when he was arrested.

On July 16, 2002, an advertisement for Faith Holdings was published in the San Diego Union-Tribune.  The advertisement was not published after July 23.  On July 31, 2002, police arrested Cole.

*The Investors* [footnoted omitted]

(1) *Ethel Correia* (counts 41 & 42 involving Cole and Robles)

The jury convicted Cole and Robles of making false statements in connection with the sale of a security (§ 25401) and making a security transaction without a broker-dealer license (§ 25210) to Ethel Correia.

In 2000, Cole reviewed and notarized the trust of Correia, who was 78 years old at the time of the trial.  Cole told Correia he could help her with her investments.  He recommended Carlmont Capital and told Correia that she would receive 8.75 percent interest per month.  Cole did not discuss the risk of the investment.  On February 3, 2000, Correia invested $120,000 in Carlmont Capital and an additional $40,000 the following month.

Nine months later, in November 2000, Cole and Robles went to Correia's home and suggested she move her investment from Carlmont Capital to Pathway Strategies, which, in turn, would invest in Alpha Telcom and provide her with a higher rate of return.  Cole said there was no risk involved and the investment would be guaranteed by Lloyds of London.  Cole also told Correia that his grandfather had invested $1 million in the telecommunications company. [footnoted omitted]. During the discussion, Robles sat quietly and listened.

Correia withdrew her money from Carlmont Capital, and in February and April 2001, invested a total of $160,000 in Pathway Strategies promissory notes with a 14 percent interest rate.  Correia believed that Cole was the sole owner of Pathway Strategies.  Cole did not tell Correia that he was not licensed to sell securities in California.  Correia testified she would not have invested in Pathway Strategies had she known it was a risky investment.  She also noted that Cole's statement about his grandfather investing in Alpha Telcom was a factor in her decision to invest.

Correia received monthly interest checks for a year from Pathway Strategies. After the checks stopped, Correia contacted Cole, who told her to speak with Robles. Robles in turn told her to speak with Cole. Robles told her that he and Cole had not invested her money in Alpha Telcom, and he did not know what Pathway Strategies had done with her money. Correia's principal was not returned to her.

(2) *Mair Nichols* (count 25 involving Cole; counts 26 & 27 involving Cole and Robles)

With respect to Mair Nichols, the jury convicted Cole and Robles of both securities crimes. Cole was also convicted of elder theft.

In 2000, Cole reviewed the trust of Nichols, who was 74 years old at the time of the trial. Cole told Nichols that he could put her money in a better investment than mutual funds. On April 12, Nichols invested $91,000 with Carlmont Capital for a three-year term. Cole discussed another investment with Nichols, but she did not have any more money to invest.

A few months later, Cole, accompanied by Robles, went to Nichols's residence and suggested she obtain a reverse mortgage on her house. Although Nichols was at first hesitant, Cole convinced her to proceed with a reverse mortgage. Nichols testified that Robles was "passive" and mostly listened to Cole during the meeting. On July 12, 2001, Nichols received a lump sum on a reverse mortgage for $122,000, and six days later, she invested $100,000 in a Pathway Strategies promissory note with a 10 percent interest rate. Cole told Nichols this was a no-risk investment and her $100,000 would "always be there" while also earning her monthly interest payments.

In 2002, Cole convinced Nichols to cash out her Carlmont Capital investment before it matured and invest the proceeds in Pathway Strategies. On April 23, 2002, after Cole and Robles terminated their business relationship, Nichols invested $25,000 in Cole's company, Investment Revolution Strategies. Cole did not discuss the risk of this investment with Nichols; he told her he would invest the money for her.

Also in April 2002, Nichols invested $50,000 in Pathway Management Group, a Nevada corporation formed by Cole and Robles two months earlier. At trial, Nichols could not remember whether Cole or Robles suggested she make this investment. In May 2002, Nichols followed Robles's suggestion that she transfer $75,000 she had in an IRA to Pathway Management Group.

Neither Cole nor Robles told Nichols that they were not licensed to sell securities in California; Nichols stated that if they had, she would have given more thought to investing with them. Nichols did not receive her principal back on her $100,000 investment in Pathway Strategies or her $25,000 investment in Investment Revolution Strategies. [footnoted omitted]. At one point, Nichols expressed her concern over the investments to Robles, who told her that he had $400,000 and could cover the amount of any loss she incurred. Robles later denied making this statement to Nichols.

(3) *Marian Goins* (counts 7 & 8 involving Cole)

The jury convicted Cole of both securities crimes in his dealings with Marian Goins.

In 2000, Cole updated the trust of Goins and talked to her about her investments. Goins, who did not have any experience in investing, told Cole she did not want to make any high risk investments. Goins, who was 74 years old at the time of the trial, invested with Cole because she trusted him and he told her she would get a better return. Cole did

not tell Goins that he was not a licensed broker-dealer.  In June 2000, Goins wrote checks for $41,000 and $61,000 to Carlmont Capital. Goins received a three-year promissory note at 9.25 percent interest.  At the end of three years, Goins received her principal back.

Cole and Robles suggested Goins invest in Alpha Telcom.  Initially, Goins was going to make the investment, but changed her mind after her daughter told her it was a bad idea.

(4) *Leonora High* (counts 10 & 11 involving Cole and Robles)

The jury convicted Cole and Robles of both securities crimes for their dealings with Leonora High.  [footnote omitted].

In September 2000, Cole reviewed High's trust and discussed investments with her.  Robles also was present.  Cole and Robles suggested High invest in Alpha Telcom, telling her they had invested $500,000 of their own money in Alpha Telcom.  Cole and Robles did not discuss the risk of the investment and did not tell her that they were not licensed to sell securities in California.  High had only $5,000 to invest, but Cole and Robles told her the minimum amount she could invest was $10,000.  High borrowed money from her insurance policy to invest $10,000 in Alpha Telcom.  On October 2, 2000, High executed a contract to purchase two pay telephones; Robles signed the contract as Alpha Telcom's "representative."  At one point, High telephoned Cole and told him she wanted her money back.  Cole said she could not get her principal back for 10 years.  After four months, the interest payments stopped.  Later, Cole and Robles sent High a letter informing her that Alpha Telcom had filed for bankruptcy.

(5) *Helen Labruzzi* (counts 52 & 53 involving Cole and Robles)

The jury convicted Cole and Robles of both securities crimes for their dealings with Helen Labruzzi.

In 2000, Cole was recommended to Labruzzi, who needed more money for living expenses and to help her children.  Initially, Labruzzi, who was 85 years old at the time of the trial, invested her entire savings of $46,000 in Carlmont Capital; she received her interest on time and her principal was returned.  Cole met with Labruzzi three or four times; Robles was present at some of these meetings.  Cole told Labruzzi that he could arrange for her to get money out of her house.  Cole set up a reverse mortgage and drafted a new will for Labruzzi.  [footnote omitted].

In late September 2000, Labruzzi invested $10,000 directly in Alpha Telcom.  In October 2001, Labruzzi received a net sum of $124,896.76 from her reverse mortgage, which she invested in Pathway Strategies with the understanding that Pathway Strategies was to fully invest $124,000 for her.  Neither Cole nor Robles discussed whether there would be any risk to her investments.

Labruzzi received payments of $1,000 for two months.  When the payments stopped, Labruzzi could not reach Cole. Robles told her that he did not know what happened to her money, and he was doing his best to pay it back.  Of the $124,000 that Labruzzi invested with Pathway Strategies, records showed $99,000 went into Cole and Robles's payroll account.  Bank records also showed that after Labruzzi's $124,000 check was deposited, Pathway Strategies did not make any investments.  Labruzzi never received back the money she invested in Pathway Strategies and Alpha Telcom.

/ / /

Cole and Robles did not tell Labruzzi that they were not licensed to sell securities in California. Had they made that disclosure, Labruzzi testified that she would have "investigated." Labruzzi also testified that if she had understood the reverse mortgage she would not have taken it out on her house.

(6) *Lisa Leginus* (counts 15 & 16 involving Cole and Robles)

The jury convicted Cole and Robles of both securities crimes for their dealings with Lisa Leginus.

Leginus met Robles in 1999 after she responded to an newspaper advertisement about investments. In 2000, Robles told Leginus he had found a good, sound investment for her. Subsequently, Cole and Robles went to Leginus's house and suggested she invest in an Oregon company selling and installing pay telephones (Alpha Telcom). Leginus told Cole and Robles that she needed to be very careful with her money and "absolutely could not lose this money." Leginus, who was 73 years old at the time of the trial, was initially skeptical because cell phones were so popular, but Cole and Robles said the pay telephones would be installed in the middle of the country where people did not use cell phones. Leginus testified that she thought Cole was angry about her hesitancy to invest; Cole told her: "[Y]ou can trust me, even my grandparents invested in this." Cole and Robles also said that her investment would be insured by a Florida bank.

On February 26, 2001, Leginus invested $30,000 in a Pathway Strategies promissory note with a 14 percent interest rate. Leginus understood the entire $30,000 would be invested in the pay telephones. Leginus received payments from Pathway Strategies for more than a year. After the payments stopped, Robles told her that he and Cole were splitting up as partners, and her funds were frozen. Robles also told her that they had not invested her money in the telephones; Robles did not tell her what they had done with her money.

Cole and Robles did not disclose to Leginus that they were not licensed to sell securities in California. Leginus said that if they had told her about their unlicensed status she would not have given them her "hard-earned money."

(7) *Marjorie Maroun* (counts 22 & 23 involving Cole and Robles)

The jury convicted Cole and Robles of both securities crimes for their dealings with Marjorie Maroun.

According to her testimony at the preliminary hearing, Maroun invested $70,000 in Alpha Telcom on October 18, 2000. [footnote omitted]. She did not receive back her principal. Cole and Robles did not tell Maroun that they were not licensed to sell securities in California. Maroun was 81 years old at the time of the 2004 preliminary hearing.

(8) *Henry and Helen Roemmich* (counts 45 & 46 involving Cole and Robles)

The jury convicted Cole and Robles of both securities crimes for their dealings with Henry and Helen Roemmich.

In February 2001, Schoeller helped the Roemmichs take out a reverse mortgage on their house. The Roemmichs received a lump sum of $135,000. Roemmich was 92 years old at the time of the trial. Shortly thereafter, Cole and Robles contacted Roemmich about investments. Cole and Robles advised Roemmich to invest $20,000

in a restaurant, $20,000 in a viatical[2] [footnote omitted], and $20,000 with his stockbroker. Roemmich followed this advice.

On February 5, Roemmich and his wife invested an additional $60,000 in a 38-month Pathway Strategies promissory note with an interest rate of 14 percent. Cole and Robles promised they would never stop paying on the investment. The Roemmichs received interest payments for more than a year. When the payments stopped, Roemmich contacted Robles. Robles did not explain what happened with the Roemmich's money and eventually stopped taking his telephone calls. Roemmich was unable to contact Cole. The Roemmichs did not receive back the principal on the $60,000 investment in Pathway Strategies, but did receive back the principal on the investments in the restaurant and the viatical.

The Roemmichs had never invested money before. Cole and Robles told them they had been in business for 14 years and had never missed a payment. Cole and Robles did not discuss risk with the Roemmichs. Cole and Robles did not tell the Roemmichs that they were not licensed to sell securities in California; had the disclosure been made, the Roemmichs would not have invested with them.

(9) *Raymond Lovins* (counts 20 & 21 involving Cole and Robles)

The jury convicted Cole and Robles of both securities crimes for their dealings with Raymond Lovins.

In 2001, Lovins responded to a Pathway Financial newspaper advertisement for investments yielding 12 percent interest and met with Cole and Robles in their office. Cole and Robles recommended investing in a telephone company that was putting pay telephones in rural areas of the country (Alpha Telcom). Cole said he had never missed a payment on a note before, the telephone company was very strong, and the investment was practically "foolproof." Because Cole and Robles had initially tried to sell him viaticals, Lovins assumed Pathway Financial was associated with life insurance companies and was therefore a strong, secure company.

On May 14, 2001, Lovins invested $20,000 in a 38-month Pathway Strategies promissory note with a 12 percent rate of interest. Lovins, who was 58 years old at the time of the trial, acknowledged that he signed a disclaimer of guarantee on the note, but testified he read it "pretty fast" and believed the provision concerned the distinction between Pathway Financial and Pathway Strategies. Lovins received interest payments for three or four months. When the payments stopped, Lovins discovered the Pathway business telephone had been disconnected and its office was empty. Robles later told Lovins that he and Cole were no longer partners, but he expected Lovins to receive checks soon. Lovins never received his principal back.

Cole and Robles did not tell Lovins that they were not licensed to sell securities in California. Had Cole and Robles disclosed this, Lovins would have thought harder about whether to invest with them.

/ / /

---

[2] According to the California Court of Appeal's opinion, a viatical is a sale of the life insurance policy of a terminally ill person to an investor so that the insured has money for support prior to death. When the insured dies, the investor receives a portion, or all, of the beneficiary proceeds of the policy.

(10) *Carol and Donald Peterson* (counts 48 & 49 involving Cole and Robles)

The jury convicted Cole and Robles of both securities crimes for their dealings with Carol and Donald Peterson.

At the time of the trial Carol Peterson was 68 years old and Donald Peterson was 70 years old. In April 2001, the Petersons responded to a newspaper advertisement for Pathway Financial offering a 12 percent return on investments and met with Cole and Robles in their business office. Cole and Robles said they would make bridge loans that were "absolutely safe" investments in companies they had investigated with due diligence. Cole and Robles did not specify the companies in which they would invest the Petersons' money. Carol Peterson recalled a discussion about a company that installed pay telephones and a company developing "[v]oice-over Internet" software. Robles told the Petersons: "You don't need to worry about your investment. This is absolutely safe. We've done the due diligence." They also said the District Attorney's office had looked at their business, and a Small Business Administration employee and a former FBI agent wanted to work for them.

In June 2001, the Petersons invested $90,000 in a 38-month Pathway Strategies promissory note with a 10 percent interest rate. When Carol Peterson asked Cole and Robles whether they needed to be licensed "by anybody," she was told that no license was required.

Following Cole and Robles's advice, the Petersons obtained a home equity loan for $208,000. On September 12, the Petersons made two more investments with Pathway Strategies-one for $100,000 and one for $67,000. In consideration for the $100,000 investment, the Petersons received a 38-month promissory note at 10 percent interest. The $67,000 promissory note provided the Petersons were to receive 10 percent interest plus 60 percent of any interest Pathway Strategies received over 14 percent.

Also in September, based on the advice of Cole and Robles, the Petersons invested $25,000 directly with NatureWell; Cole and Robles received a commission. Cole and Robles told the Petersons the value of the NatureWell stock would probably triple in three years. Carol Peterson had tried NatureWell's migraine headache medicine and contact lens products and thought they were very good.

The Petersons also invested $78,000 in a viatical purchased through Mutual Benefits of Florida, a company promoted by Cole and Robles. The Securities and Exchange Commission issued a restraining order against Mutual Benefits of Florida, and none of this investment was returned to the Petersons.

In July 2002, the Petersons stopped receiving monthly interest payments on their investments. Over the next 12 months, Robles continued to tell Carol Peterson that he would find a way to bring the interest payments up to date through various income-generating plans. None of them came to fruition. Robles did not return Carol Peterson's telephone calls after July 31, 2003. The Petersons did not receive back the principal on their investments.

(11) *George Quintero* (counts 34 & 35 involving Cole and Robles)

The jury convicted Cole and Robles of both securities crimes for their dealings with George Quintero.

/ / /

In 2001, Cole went to Quintero's home to review his trust.  Cole asked Quintero, who was 77 years old at the time of the trial, if he was interested in other investments. Cole told Quintero that with a minimum investment of $25,000, he could invest in a promissory note that paid 8 percent interest or in a viatical.

In June 2001, Quintero went to Cole and Robles's office and invested in a 36-month viatical and a 14-month $25,000 Pathway Strategies promissory note with an interest rate of 8 percent.  The 14-month term of the promissory note would allow Quintero to use the principal for his planned 50th wedding anniversary celebration in Europe.  Cole and Robles told Quintero that the investment was risk-free.  Cole and Robles did not tell Quintero that they were not licensed to sell securities in California. Quintero testified that such a disclosure would have "[a]bsolutely" made a difference in his decision to invest with Cole and Robles.

Quintero received interest payments for 10 months.  When the payments stopped, Quintero telephoned and drove to Pathway's offices to no avail.  Quintero was told that Cole and Robles had moved out the previous day. Cole later told him that Robles had fired him and kept the money.  Robles told Quintero that he did not know what happened to his money, but he would try to return it.  Quintero never received his principal on the investment.

(12) *Albert Flory* (counts 5 & 6 involving Cole and Robles)

The jury convicted Cole and Robles of both securities crimes for their dealings with Albert Flory.

In 2000, Flory met Cole and Robles after responding to an advertisement in the San Diego Union-Tribune about well-secured investments yielding interest payments exceeding 12 percent.  Cole and Robles told Flory, who was 86 years old at the time of the trial, that they offered various investments and they would put his money in the one with the highest interest yield.  Flory told Cole and Robles: "[If] you lose my money, you lose your life."  Cole and Robles responded the risk was low; it was as "good as gold."

On July 24, 2001, Flory invested $60,000 in a one-year Pathway Strategies promissory note with a 12 percent interest rate.  At the end of the year, Flory did not receive the principal back.  Flory telephoned Cole and Robles, but their business telephone had been disconnected.  Their office was empty. Robles later told Flory that he was trying to collect about $200,000 from other investments.

Cole and Robles did not tell Flory they were not licensed to sell securities in California.  Robles showed Flory a card that indicated he was licensed in Nevada.  Flory would have acted earlier to recoup his investment had he known that Cole and Robles did not have a license to sell securities in California.

(13) *Elvira and Feliciano DaSilveira* (counts 1 & 2 involving Cole)

The jury convicted Cole of both securities crimes for his dealings with Elvira and Feliciano DaSilveira.

In 2000, Cole reviewed the trust prepared by Schoeller for Elvira and Feliciano DaSilveira, who at the time of the trial were 56 years old and 62 years old respectively. Cole suggested they invest in Carlmont Capital.  Cole told the DaSilveiras that it was a low or no-risk investment.  In June 2000, the DaSilveiras invested $81,000 in Carlmont Capital and received their money back after the note matured on July 6, 2001.

In 2002, Cole told Elvira DaSilveira that if she invested in his company, Faith Holdings, she would receive a 10 percent return. Cole said the new investment was low or no risk. On July 1, the DaSilveiras transferred their life savings of $104,000 to Faith Holdings, believing the entire amount was to be invested in a credit card machine company. On August 5, a superior court judge ordered Cole's Faith Holdings bank account frozen; the DaSilveiras eventually received their money back.

(14) *Elizabeth Petersen* (counts 28, 29, 30 & 31 involving Cole)

The jury convicted Cole of residential burglary, elder theft and both securities crimes for his dealings with Elizabeth Petersen.

On July 30, 2002, Cole went to Petersen's house after she responded to a newspaper advertisement for Faith Holdings that promised a 10 percent return. Petersen, who was 80 years old at the time of the trial, told Cole that she had approximately $100,000 to invest. Cole suggested Petersen purchase a promissory note issued by Faith Holdings and indicated the money would be invested in a "mom and pop" trucking company, a rest home in Florida, and a company that marketed machines to process credit card purchases for supermarkets. Cole did not discuss the risk of these investments; he also did not tell Petersen that he was not licensed to sell securities in California.

Petersen decided to invest with Cole, who insisted that she obtain a cashier's check. Cole said he would return in a few hours after Petersen went to the bank. Petersen wanted to check out Cole and was referred to the office of the Secretary of State. She left a message with the office. When Cole returned, Petersen gave him a cashier's check for $100,000, and he gave her a promissory note. After Cole left, someone from the office of the Secretary of State returned Petersen's call and informed her that Cole had lost his brokerage license. Petersen contacted the District Attorney's office.

Petersen telephoned Cole and told him that she wanted to invest another $100,000, and she and Cole set up an appointment for the following day. When Cole returned on July 31, two police detectives were in an adjoining room listening to the conversation between Cole and Petersen. Other police detectives were situated outside so they could arrest Cole when he left the house.

Cole brought another Faith Holdings promissory note for Petersen. In response to an inquiry from Petersen, Cole told her he did not have to be licensed because he was a principal in the corporation. When Petersen pointed out that the name of the company was not on the promissory note, Cole said he would retrieve a company stamp from his car, and promptly left the house. The detectives in the house did not have time to alert the detectives outside not to arrest Cole at that time. Cole was arrested outside Petersen's house.

On August 5, Faith Holdings' bank account was frozen by court order. Petersen's money was returned to her approximately one month later.

(Lodgment No. 2 at 5-26.)

/ / /

/ / /

/ / /

### III.      PROCEDURAL BACKGROUND

On May 16, 2005, the San Diego County District Attorney filed a second amended information charging Cole[3] with sixteen counts of making a material, false statement in connection with the sale of a security, in violation of California Corporations Code (Corporations Code) sections 25401 and 25540, sixteen counts of acting as a broker/dealer in connection with the purchase and sale of securities without first securing a certificate authorizing him to do so, in violation of Corporations Code section 25210(a), twelve counts of residential burglary, in violation of California Penal Code (Penal Code) sections 459/460, and nine counts of theft of over four hundred dollars from an elder, in violation of Penal Code section 368(d). (Lodgment No. 1, vol. 1 at 0111-28.) The information also alleged that the aggregate amount stolen exceeded one hundred and fifty thousand dollars, within the meaning of Penal Code section 12022(a)(2), and that Cole had committed two or more related felonies involving fraud or embezzlement which involved the taking of over five hundred thousand dollars, within the meaning of Penal Code section 186.11(a)(2). (*Id.*)

Following a jury trial, the jury convicted Cole of fourteen counts of making a false statement in connection with the sale of a security (counts one, five, seven, ten, fifteen, twenty, twenty-two, twenty-six, thirty, thirty-four, forty-one, forty-five, forty-eight and fifty-two), fourteen counts of being a broker/dealer in connection with the purchase or sale of a security without a certificate (counts two, six, eight, eleven, sixteen, twenty-one, twenty-three, twenty-seven, thirty-one, thirty-five, forty-two, forty-six, forty-nine, and fifty-three), two counts of elder theft (counts twenty-five and twenty-nine), and one count of residential burglary (count twenty-eight). (Lodgment No. 1, vol. 3 at 0600-03.) The jury also found the two monetary enhancements true. (*Id.* at 0600.) Cole was sentenced to a total of seventeen years in prison. (*Id.* at 0600-03.)

Cole appealed his conviction and sentence to the California Court of Appeal. (Lodgment Nos. 7, 8.) In a written opinion certified for partial publication, the court overturned eleven of Cole's convictions for being a broker/dealer in connection with the purchase or sale of a security without a certificate (counts two, six, sixteen, twenty-one, twenty-seven, thirty-one, thirty-five, forty-two, forty-

---

[3] Frank Anthony Robles, Cole's business partner, was also charged with various offenses and was tried together with Cole.

1  six, forty-nine and fifty-three) because of faulty jury instructions.  (Lodgment No. 2 at 66-69.)  In

2  addition, the Court reversed two of Cole's convictions for making material false statements in

3  connection with the sale of a security (counts seven and twenty-two).  (*Id.* at 71-72, 81.)  The court

4  remanded the case for a new trial on those counts and for resentencing.[4]  (*Id.* at 96.)

5       Cole filed a petition for review in the California Supreme Court.  (Lodgment No. 3.)  That court

6  denied the petition without citation of authority.  (Lodgment No. 4)

7       March 30, 2009, Cole filed a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254

8  in this Court.  (Doc. No. 1.)  Respondents filed an Answer and Memorandum of Points and Authorities

9  in support of the Answer on October 26, 2009.  (Doc. No. 16.)  Petitioner filed a Traverse on January

10  28, 2010.  (Doc. No. 28.)  Petitioner also filed a motion to expand the record on May 17, 2010, asking

11  to augment the record with the sealed transcripts of hearings conducted pursuant to *People v. Marsden*,

12  2 Cal. 3d 118 (1970).[5]  The Court granted the motion.  (*See* Doc. No. 34.)

13  **IV.    DISCUSSION**

14       A.    *Standard of Review*

15       This Petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act

16  of 1996 ("AEDPA").  *See Lindh v. Murphy*, 521 U.S. 320 (1997).  Under AEDPA, a habeas petition will

17  not be granted with respect to any claim adjudicated on the merits by the state court unless that

18  adjudication: (1) resulted in a decision that was contrary to, or involved an unreasonable application of

19  clearly established federal law; or (2) resulted in a decision that was based on an unreasonable

20  determination of the facts in light of the evidence presented at the state court proceeding.  28 U.S.C.

21  § 2254(d); *Early v. Packer*, 537 U.S. 3, 8 (2002).  In deciding a state prisoner's habeas petition, a federal

22  court is not called upon to decide whether it agrees with the state court's determination; rather, the court

23  applies an extraordinarily deferential review, inquiring only whether the state court's decision was

24
25       [4]  The parties have not informed the Court, nor does the record reflect, what happened following the
     California Court of Appeal's reversal.  It appears Cole received the same sentence on remand despite the fact that,
26   while his sentences for the reversed broker/dealer convictions were concurrent, Cole had received two consecutive
     sentences of eight months in prison for each of the two convictions for making a material false statement (counts
27   seven and twenty two).  (Lodgment No. 1, vol 3 at 0600-03.)  The Court can only surmise the reversed counts
     were dismissed and Cole was resentenced to the same amount of prison time on remand.  In any event, Cole does
28   not challenge the constitutionality of his sentence.

       [5]  Under *Marsden*, criminal defendants in California may ask the court to discharge their appointed
     attorney and appoint a new attorney when their right to effective representation is jeopardized.

objectively unreasonable.  *Yarborough v. Gentry*, 540 U.S. 1, 4 (2003); *Medina v. Hornung*, 386 F.3d 872, 877 (9th Cir. 2004).  Additionally, the state court's factual determinations are presumed correct, and Cole carries the burden of rebutting this presumption with "clear and convincing evidence."  28 U.S.C.A. § 2254(e)(1) (West 2006).

A federal habeas court may grant relief under the "contrary to" clause if the state court applied a rule different from the governing law set forth in Supreme Court cases, or if it decided a case differently than the Supreme Court on a set of materially indistinguishable facts.  *Bell v. Cone*, 535 U.S. 685, 694 (2002).  The court may grant relief under the "unreasonable application" clause if the state court correctly identified the governing legal principle from Supreme Court decisions but unreasonably applied those decisions to the facts of a particular case.  *Id.*  Additionally, the "unreasonable application" clause requires that the state court decision be more than incorrect or erroneous; to warrant habeas relief, the state court's application of clearly established federal law must be "objectively unreasonable."  *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003).

Where there is no reasoned decision from the state's highest court, the Court "looks through" to the underlying appellate court decision.  *Ylst v. Nunnemaker*, 501 U.S. 797, 801-06 (1991).  If the dispositive state court order does not "furnish a basis for its reasoning," federal habeas courts must conduct an independent review of the record to determine whether the state court's decision is contrary to, or an unreasonable application of, clearly established Supreme Court law.  *See Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir. 2000) (overruled on other grounds by *Andrade*, 538 U.S. at 75-76); *accord Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003).  However, a state court need not cite Supreme Court precedent when resolving a habeas corpus claim.  *Early*, 537 U.S. at 8.  "[S]o long as neither the reasoning nor the result of the state-court decision contradicts [Supreme Court precedent,]" *id.*, the state court decision will not be "contrary to" clearly established federal law.  *Id.*  Clearly established federal law, for purposes of § 2254(d), means "the governing principle or principles set forth by the Supreme Court at the time the state court renders its decision."  *Andrade*, 538 U.S. at 72.

Where a petitioner alleges a state court decision is based upon an unreasonable determination of the facts in light of the evidence presented in state court, he or she must demonstrate that the factual

/ / /

1    findings upon which the state court's adjudication rests is objectively unreasonable.  *Miller-El v.*

2    *Cockrell*, 537 U.S. 322, 340 (2003).

3          B.    *Analysis*

4          Cole raises five claims in his Petition.  First, he argues the trial court improperly denied him his

5    Sixth Amendment right to represent himself, in violation of *Faretta v. California*, 422 U.S. 806 (1975).

6    (Pet. at 7.)  Second, he claims there was insufficient evidence to support his convictions for being a

7    broker/dealer involved in the purchase or sale of a security without certification with regard to victims

8    Marion Goins, Lenora High and Marjorie Maroun (counts eight, eleven and twenty-three).  Specifically,

9    he argues there was insufficient evidence he knew he was selling securities within the meaning of

10   Corporations Code section 25210.  (Pet. at 9.)  Third, he contends there was insufficient evidence to

11   support his convictions for being a broker/dealer involved in the purchase or sale of a security without

12   certification with regard to victims Elvira and Feliciano DaSilveira, Albert Flory, Lisa Leginus,

13   Raymond Lovins, Mair Nichols, Elizabeth Peterson, George Quintero, Elizabeth Correia, Henry and

14   Helen Roemmich, Donald and Carol Petersen and Helen Labruzzi (counts two, six, sixteen, twenty-one,

15   twenty-seven, thirty-one, thirty-five, forty-two, forty-six, forty-nine, and fifty-three).  He claims there

16   was insufficient evidence he was a "broker/dealer" within the meaning of Corporations Code section

17   25210.  (Pet. at 10.)  Fourth, he argues there was insufficient evidence presented to support the elder

18   theft conviction with regard to victims Mair Nichols and the elder theft and residential burglary

19   convictions with regard to victim Elizabeth Peterson (counts twenty-five, twenty-eight and twenty-nine)

20   because he did not have the intent to permanently deprive the victims of their money.  (Pet. at 12.)

21   Finally, Cole claims there was insufficient evidence to support his convictions for making a material

22   false statement in connection with the purchase or sale of a security with regard to victims Elvira and

23   Feliciano DaSilveira, Lenora High, Lisa Leginus, Raymond Lovins, Elizabeth Peterson, Elizabeth

24   Correia, Henry and Helen Roemmich and Helen Labruzzi (counts one, ten, fifteen, twenty, thirty, forty-

25   one, forty-five, fifty-two).  He argues there was insufficient evidence that he knowingly made false

26   statements or omissions.  (Pet. at 14.)

27         As to claim one, Respondent argues the state court's adjudication of the claim was neither

28   contrary to, nor an unreasonable application of, clearly established Supreme Court law.  (Resp't's Mem.

P. & A. Supp. Answer at 25-31.)  As to claims two through five, Respondent first contends that Cole has failed to comply with Rule 2(c) of the Rules Following 28 U.S.C. § 2254 because he has not stated a claim for relief with sufficient specificity.[6]  (*Id.* at 31-32, 34-36, 39-40.)  In the alternative, Respondent argues the state court's adjudication of these claims was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law.  (*Id.* at 32-48.)

       1.    *Faretta Violation (Claim One)*

       Cole claims his Sixth Amendment right to represent himself, as expressed in *Faretta*, was violated by the state trial judge's refusal to grant his pretrial requests for self-representation.  (Pet. at 7.) Respondent argues the state court's denial of this claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law because the record supports the trial court's conclusion that the requests were made to disrupt and delay the proceedings.  (Resp'ts Mem. P. & A. Supp. Answer at 28-31.)

       In support of its analysis, the state appellate court made the following factual findings, to which this Court must defer under 28 U.S.C. § 2254(e)(1).  Moreover, these factual findings are objectively reasonable and are amply supported by the record.  *See* 28 U.S.C. § 2254(d)(2).  At a hearing held on January 31, 2005, Cole told the court he wanted to represent himself.  (Lodgment No. 2 at 28; Lodgment No. 6 (transcript of proceedings), vol. 4 at 109.)  The court told Cole his request would be considered at a February 4, 2005 hearing.  (Lodgment No. 2 at 28; Lodgment No. 6, vol. 4 at 109.)  At the February 4 hearing, Cole indicated he wanted to represent himself, but that he wanted to have advisory counsel as well.  (Lodgment No. 2 at 28; Lodgment No. 6, vol. 5 at 301-02, 305.)  Cole also told the court that he would not sign the *Lopez*[7] waiver form "because I do not believe, as an individual wanting to represent myself, I should sign a waiver of any sort."  (Lodgment No. 2 at 28; Lodgment No. 6, vol. 5 at 303.)  He indicated there were several things on the waiver form he did not "acquiesce" to. (Lodgment No. 2 at 28; Lodgment No. 6, vol. 5 at 303.)  The court noted Cole had gone through six

---

     [6]  The Court concludes that Petitioner has pleaded his claims with sufficient specificity to satisfy Rule 2(c) of the Rules Following 28 U.S.C. § 2254 and thus reaches the merits of each of Cole's claims.

     [7]  In California, defendants who wish to represent themselves are asked to fill out a document entitled a "*Lopez* waiver," the content of which is based on suggestions made by the court in *People v. Lopez*, 71 Cal. App. 3d 568, 572-74 (1977).  The *Lopez* waiver details the rights a defendant gives up when choosing to represent himself and the risks of self-representation.

attorneys, and then explained to Cole the pitfalls of representing himself. (Lodgment No. 2 at 28; Lodgment No. 6, vol. 5 at 304-05.) Cole indicated he understood, then told the court he wanted to represent himself "with the assistance of counsel." (Lodgment No. 2 at 28; Lodgment No. 6, vol. 5 at 28-29.) The trial court concluded that Cole's request was equivocal because his request to represent himself was contingent upon being granted advisory counsel and because his past conduct — filing motions in the trial court and the court of appeal which were without legal basis and his argumentative behavior during hearings — indicated he would be unable to represent himself without disrupting the proceedings. (Lodgment No. 2 at 28-29; Lodgment No. 6, vol. 5 at 307-08.) The *Faretta* request was denied. (Lodgment No. 2 at 29; Lodgment No. 6, vol. 5 at 308-09.)

Cole asked to represent himself again on March 3, 2005. (Lodgment No. 2 at 29; Lodgment No. 6, vol. 6 at 602.) At this hearing, Cole did not request advisory counsel, but again refused to sign the *Lopez* waiver. (Lodgment No. 2 at 29; Lodgment No. 6, vol. 6 at 602.) When asked why he would not sign it, Cole stated that he did not believe that *Faretta* required him to waive any of his constitutional rights. He stated he would not sign the waiver, but still wanted to represent himself. (Lodgment No. 2 at 29-30; Lodgment No. 6, vol. 6 at 602-03.) The trial court told Cole his request to represent himself would be denied because Cole was attempting to place conditions on his request to represent himself which were not supported by *Faretta* or California law. (Lodgment No. 2 at 30; Lodgment No. 6, vol. 6 at 603.) The trial court also found that Cole's continuing refusal to sign the form and his insistence that under *Faretta* he need not waive any of his constitutional rights were evidence that the true purpose of his request was to disrupt and delay the proceedings. (Lodgment No. 2 at 30; Lodgment No. 6, vol. 6 at 603.)

Cole raised his *Faretta* claim in the petition for review he filed in the California Supreme Court. (Lodgment No. 3.) That court denied the petition without citation of authority. (Lodgment No. 4.) Accordingly, this Court must "look through" to the state appellate court's opinion denying this claim as the basis for its analysis. *Ylst*, 501 U.S. at 803. Citing *Faretta* and California law, the appellate court noted a defendant in a criminal case has "the right to personally defend himself or herself" but the request to do so must be "timely and unequivocal." (Lodgment No. 2 at 30-31, citing *Faretta*, 422 U.S. at 819-20, 835-36, *People v. Dunkle*, 36 Cal. 4th 861, 908 (2005) and *People v. Marshall*, 15 Cal. 4th

1, 20-21 (1997)).  The state appellate court also noted that because a defendant's request to represent

himself is "effectively a waiver of the right to counsel[, it] must be made knowingly, intelligently,

voluntarily and unequivocally, after being informed of the dangers and disadvantages of self-

representation."  (*Id.* at 31, citing *Faretta*, 422 U.S. at 835-36, *People v. Valdez*,  32 Cal. 4th 73, 98-99

(2004) and *Dunkle*, 36 Cal. 4th at 908.)   With these authorities in mind, the state appellate court

concluded as follows:

> *Analysis*
>
> *Faretta* and its progeny make clear that a defendant's self-representation request is properly denied when the request is: equivocal, and/or conditional; not accompanied by a waiver of the right to counsel that is voluntarily, knowingly and intelligently made; or made for the purpose of delay or to frustrate the orderliness of the proceedings.
>
> Contrary to Mr. Cole's claims, the court did not deny his *Faretta* request solely because he refused to sign the *Lopez* form.  Rather, the record shows the court based its denial on at least two proper factors: Cole's effort to frustrate and disrupt the proceedings; and his refusal to waive his right to counsel.
>
> In *People v. Welch* (1999) 20 Cal.4th 701, 734, the California Supreme Court made clear that a trial court may deny a *Faretta* motion when it reasonably believes, based on the defendant's prior conduct, that self-representation will cause disruption in the proceedings.  "'The right of self-representation is not a license to abuse the dignity of the courtroom.  Neither is it a license not to comply with relevant rules of procedural and substantive law'" that are "critical to the viable functioning of the courtroom."  (*Ibid.*, quoting *Faretta*, *supra*, 422 U.S. at p. 835, fn. 46.)
>
> The record supports the court's stated concerns about Cole's ability to conduct himself in a way that would not disrupt the proceedings.  By the time of the March 3 hearing, Cole's actions made clear that he expected special treatment and that he was intent on delaying the proceedings.  At his arraignment, Cole interrupted the proceedings to object that he had not been advised of his rights even though his counsel indicated otherwise.  Then, when the court started to make the advisement, Cole interrupted again and said: "I'm not going to proceed with that.  I need to have a discussion with you first, sir."  Additionally, although repeatedly admonished to speak through counsel, Cole ignored the court's directive and insisted on speaking directly with the judge.
>
> Cole's interest in delaying the court proceedings was also evident in his numerous requests to change counsel and the inevitable continuances(s) associated with each change.  Roberts was Cole's sixth attorney since the proceedings began.  At the time of his second self-representation request, Cole had had three retained counsel, three appointed counsel, two *Marsden* hearings, and two *Faretta* hearings.  When a defendant "juggl[es] his *Faretta* rights with his right to counsel interspersed with *Marsden* motions," the defendant can be seen as attempting "'"to obstruct the orderly administration of justice."'"  (*People v. Williams* (1990) 220 Cal.App.3d 1165, 1170.)
>
> Cole's attitude toward the "Acknowledgement Concerning the Right of Self-Representation" was further evidence that Cole was attempting to not only frustrate the orderliness of the proceedings, but to interfere with the court's obligation to confirm he was knowingly giving up his right to appointed counsel.  When the court attempted to

discuss the form with Cole on February 4, he said he did not "acquiesce" on several points on the form. Cole took a similar attitude on March 3, when he again made clear he did not intend to waive any rights and insisted that based on his reading of *Faretta*, his request for self-representation did not require him to "give a waiver of any of [his] constitutional rights."

A voluntary, knowing and intelligent waiver of the right to counsel is a prerequisite to self-representation. As our Supreme Court has pointed out, the right to counsel and the right to self-representation are mutually exclusive. (*People v. Marshall*, *supra*, 15 Cal.4th at p. 20.) "The right to representation by counsel persists until a defendant affirmatively waives it, and courts indulge every reasonable inference against such a waiver." (*People v. Dunkle*, *supra*, 36 Cal.4th at p. 908.) "[I]n order to protect the fundamental constitutional right to counsel, one of the trial court's tasks when confronted with a motion for self-representation is to determine whether the defendant truly desires to represent himself or herself." (*People v. Marshall*, *supra*, at p. 23.)

On two occasions, the court attempted to use the standard form to confirm that Cole understood the responsibilities and consequences of the right to forego counsel and thereby had made a voluntary and knowing waiver of his right to counsel. But on both occasions Cole interrupted this process and remained adamant that he was not going to acquiesce to certain requirements. As a direct result, the court had no way of knowing which issues Cole found unacceptable. Was it the fact that he would not be given special treatment because of his pro. per. status? That he must follow all substantive and procedural rules of law? That he would not automatically be provided with a special investigator? That he gave up the right to raise ineffective assistance of counsel on appeal with respect to his self-representation? Or was it that he waived his right to counsel? Because of Cole's own conduct, the court was left without a valid waiver of the right to counsel from a defendant claiming he wanted to represent himself, and no ability to determine if the request was knowingly and intelligently made.

We agree that a denial of a *Faretta* request cannot be based *solely* on the refusal to sign a written waiver. (See *People v. Silfa*, *supra*, 88 Cal.App.4th at pp. 1321-1322 [although standard acknowledgment/waiver form has been approved as a tool to inform defendant of dangers of self-representation and to ensure a knowing and voluntary waiver of counsel, the form is not "a test that a defendant seeking self-representation must pass"].) Further, the standard "*Lopez*" form is not the only way for a trial court to determine whether a defendant's request to represent himself or herself is knowingly and intelligently made. The court can obtain a valid oral waiver of the right to counsel if proper advisements are made and the defendant demonstrates an understanding of the risks and responsibilities of self-representation.

But when a defendant refuses to allow the court to undertake its obligation to confirm that his or her waiver was voluntarily, knowingly and intelligently made, as Cole did here, there cannot be a valid waiver. By his obstructionist conduct on February 4 and March 3, Cole made it clear that an attempt to elicit a valid oral — as opposed to written — waiver would have been futile as well.

Finally, we reject Cole's claim that because he did not engage in the same type of misconduct as the defendant in *People v. Welch*, *supra*, 20 Cal.4th at page 735, who "belligerently denied awareness of a calendar date that was set in his presence; []turned his back on the trial court when addressing it; []interrupted the trial court several times to argue what the court had declared to be a nonmeritorious point; [] accused the court of misleading him; [] refused to allow the court to speak and [] refused several times to follow the court's admonishment of silence," the court erred in denying his *Faretta* motion. Admittedly, the defendant in *Welch* caused more disruption in the courtroom

1    than Cole, but this is not determinative.  The standard is not whether a defendant's
2    misconduct and/or manipulative behavior rivals that of disorderly, manipulative
     defendants in other cases.  Rather, the court must analyze each case individually and
3    carefully evaluate the nature and import of the defendant's behavior.  Although Cole's
     conduct was not belligerent and did not present a security concern, he used a more subtle
4    way to disrupt and delay the proceedings: changing retained counsel, requesting changes
     in appointed counsel; ignoring the court's admonishment to allow his counsel to speak
5    on his behalf; and insisting on self-representation but interfering with the court's ability
     to determine the validity of his request.  (See *People v. Carson* (2005) 35 Cal.4th 1, 10.)
6    The trial court could reasonably infer from the defendant's aggregate conduct that self-
     representation would cause disruption.  (See *People v. Welch*, *supra*, at p. 735.)

7    (Lodgment No. 2 at 32-36.)

8          The Sixth Amendment to the United States Constitution guarantees a defendant in a criminal

9    case the right to be represented by counsel.  *Faretta*, 422 U.S. at 807.  The Sixth and Fourteenth

10   Amendments also guarantee a defendant the right to represent himself, but in order to invoke this right,

11   a defendant must waive his Sixth Amendment right to counsel and the waiver must be "knowing,

12   voluntary and intelligent."  *See Iowa v. Tovar*, 541 U.S. 77, 88-89 (2004) (citing *Faretta*, 422 U.S. at

13   806); *see also Faretta*, 422 U.S. at 835.  "When a defendant elects to waive the right to be represented

14   by trial counsel, '[w]arnings of the pitfalls of proceeding to trial without counsel . . . must be rigorously

15   conveyed.'"  *Tovar*, 541 U.S. at 89.

16         Further, a defendant's *Faretta* request must also be timely, unequivocal and not made for

17   purposes of delay.  *Sandoval v. Calderon*, 241 F.3d 765, 774 (9th Cir. 2001).  While no formal script

18   is required to invoke the right and obtain the waiver, courts should consider "a range of case-specific

19   factors, including the defendant's education or sophistication, the complex or easily grasped nature of

20   the charge, and the stage of the proceeding."  *Tovar*, 541 U.S. at 88-89 (citing *Johnson v. Zerbst*, 304

21   U.S. 458, 464 (1938)).  Although the court *may* appoint standby counsel to assist a pro se defendant,

22   there is no federal constitutional right to standby counsel.  *MacKaskle v. Wiggins*, 465 U.S. 168, 176-77

23   (1984).  The state court cited and applied *Faretta* and California law consistent with *Faretta* and did not

24   decide this case differently than *Faretta* on a set of materially indistinguishable facts.  Therefore, the

25   state court's decision is not "contrary to" clearly established Supreme Court law.  *Williams*, 529 U.S.

26   at 412-13.

27         Nor is the state appellate court's decision an unreasonable application of *Faretta*.  Cole's first

28   *Faretta* request at the February 4, 2005 hearing was equivocal because it was conditional upon being

provided with the assistance of counsel.  Cole also stated he would not sign any kind of waiver because there were several things on the form which he did not "acquiesce to," one of which is a waiver of the right to counsel.  (*See* Lodgment No. 6, vol. 5 at 303  ["I don't believe as an individual representing myself, I should sign of waiver of any sort."; *id.* at 305 ["I'm asking to represent myself with the assistance of counsel."]  A *Faretta* request which is conditioned on the provision of standby counsel is equivocal.  *United States v. Mendez-Sanchez*, 563 F.3d 935, 946 (9th Cir. 2009) (citing *United States v. Salemo*, 81 F.3d 1453, 1460 (9th Cir. 1996) and *United States v. Kienenberger*, 13 F.3d 1354, 1356 (9th Cir. 1994).)

Cole's second request occurred on March 3, 2005.  At that hearing, he did not condition his *Faretta* request on the appointment of standby counsel.  He did, however, continue to refuse to sign the *Lopez* waiver because he did not believe *Faretta* required him to "sign or give a waiver of any of [his] constitutional rights."  (Lodgment No. 6, vol. 6 at 602.)  Although not as explicit as he was at the February 4, 2005 hearing, the trial court reasonably concluded Cole's statement meant that he continued to refuse to waive his Sixth Amendment right to counsel.  Further, as the appellate court found, it was reasonable for the trial court to conclude that  Cole's argumentative stance with regard to his refusal to either sign the *Lopez* waiver or to clearly and unequivocally waive his right to counsel, coupled with his repeated requests to substitute counsel, indicated that his request to represent himself was merely his latest attempt to delay and disrupt the proceedings.  (*See* Lodgment No. 2 at 32-36.)

For all the foregoing reasons, the appellate court's denial of Cole's *Faretta* claim is neither contrary to, nor an unreasonable application of, clearly established Supreme Court law.  *Williams*, 529 U.S. at 412-13.  It is also not based on an unreasonable determination of the facts.  28 U.S.C. § 2254(d)(2).  Accordingly, he is not entitled to relief as to this claim.

### 2.    *Insufficiency of the Evidence Claims (Claims Two, Three, Four and Five)*

In claims two, three, four and five, Cole alleges there was insufficient evidence to support many of his convictions.  In claim two, Cole attacks his convictions in counts eight, eleven and twenty-three (broker-dealer transacting a security without a license).  Specifically, he argues the prosecution did not prove he knew he was selling securities, within the meaning of Corporations Code sections 25540(a) and 25210(a).  (Pet. at 9.)  In claim three, Cole contends his convictions in counts two, six, sixteen, twenty-

one, twenty-seven, thirty-one, thirty-five, forty-two, forty-six, forty-nine and fifty-three (broker-dealer transacting a security without a license) must be overturned because the prosecution did not prove he was a "broker dealer" within the meaning of Corporations Code sections 25540(a) and 25210(a).  (Pet. at 10.)  In claim four, Cole alleges there was insufficient evidence to support his convictions in counts twenty-five, twenty-eight and twenty-nine (elder theft and burglary) because the prosecution did not establish he had the intent to permanently deprive the victims of their money.  (Pet. at 12.)  Finally, in claim five, Cole argues his convictions in counts one, ten, fifteen, twenty, thirty, forty-one, forty-five and fifty-two (making a false statement or omission in connection with the sale of a security) must be reversed because there was insufficient evidence to establish he knowingly made false statements or omissions, within the meaning of Corporations Code sections 25401 and 25540.  (Pet. at 14.)  Respondent counters that the state court's adjudication of these claims was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law.  (Mem. P. & A. Supp. Answer at 32-48.)

     a.   *Counts Eight, Eleven and Twenty-Three (Corp. Code Section 25210(a) (Claim Two)*

Cole contends there was insufficient evidence presented to support his convictions in counts eight, eleven and twenty-three for selling securities without a broker/dealer license in violation of Corporations Code section 25210(a).  (Pet. at 9.)  Specifically, Cole argues that he did not know the Carlmont Capital and Alpha Telcom products were securities under California law.  (Lodgement No. 3 at 19-23.)  Respondent contends the state court's adjudication of this claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law.  (Resp'ts Mem. P. & A. Supp. Answer at 31-34.)

Cole raised this claim in the petition for review he filed in the California Supreme Court, which denied the petition without citation of authority.  (*See* Lodgment Nos. 3, 4.)  Accordingly, this Court must "look through" to the California appellate court's opinion denying this claim.  *Ylst*, 501 U.S. at 803. That court conducted an exhaustive analysis of the claim, beginning with the legislative purposes behind California's securities laws:

        Section 25210 was enacted as part of a comprehensive reform of California's securities laws passed by the Legislature as the Corporate Securities Law of 1968 (the

Corporate Securities Law).  (§ 25000 et seq.; see generally 1 Marsh & Volk, Practice Under the California Securities Laws (2007) § 1.01 et seq. (Marsh & Volk).)  The primary objective of the Corporate Securities Law was the "creation of a balanced regulatory scheme to cope with the problems of modern securities markets in California." (March & Volker, *supra*, 21 1.01, p. 1-3.)  As is relevant here, all offers and sales of securities in California must be qualified with the Commissioner of the [Department of Corporations] (the Commissioner) unless specifically exempted.  (§ 25110.)   Only broker-dealers may sell securities, unless exempted.   (§ 25210.)  Deceptive practices, such as utilizing false or misleading statements in the purchase or sale of securities, are prohibited.  (§ 25401.)

Section 25210 provides that unless statutorily exempted, "no broker-dealer shall effect any transaction in, or induce or attempt to induce the purchase or sale of, any security in this state unless the broker-dealer has first applied for and secured from the commissioner a certificate, then in effect, authorizing that person to act in that capacity." (§ 25210, subd. (a).)  A violation occurs when an individual acting in the capacity of a broker-dealer (as defined by statute) sells a security (also defined by statute) without the requisite certificate (license).  The focus of this section is directed at the individual acting in the capacity of a broker-dealer, as opposed to those sections (i.e., § 25110) that focus on the nature of the instrument sold to the public.  The license requirement is designed to regulate the conduct of those selling securities, thereby protecting the public against unscrupulous operators.

Section 25540, subdivision (a), sets forth the criminal sanctions for violations of section 25210.  It provides: "Except as provided for in subdivision (b), any person who *willfully* violates any provision of this division, or who *willfully* violates any rule or order under this division, shall upon conviction be fined not more than one million dollars ($1,000,000), or imprisoned in the state prison, or in a county jail for not more than one year, or be punished by both that fine and imprisonment; but no person may be imprisoned for the violation of any rule or order if he or she proves that he or she had no knowledge of the rule or order."  (Italics added.)

[footnote 20: Section 25540, subdivision (a) sets forth the punishment for nonfraudulent violates of the Corporate Securities Law.  Fraudulent violations, such as making misrepresentations in the sale of securities (§ 25401), are punishable by a maximum $10 million fine and/or imprisonment for two, three or five years.  (§ 25540, subd. (b).)]

(Lodgment No. 2 at 48-49.)

After noting that "[t]here is little authority examining the mental state required for criminal violations of section 25210," the court analyzed two cases which "address this issue in related statutes: *People v. Simon* (1995) 9 Cal.4th 493 (*Simon*), dealing primarily with misrepresentations in the sale of securities (section 25401); and *People v. Salas* (2006) 37 Cal.4th 967 (*Salas*), dealing primarily with the sale of unregistered or unqualified securities (section 25110)."  (*Id.* at 49.)  In *Simon*, the California Supreme Court held that the prosecution had to establish a defendant had "guilty knowledge" in order to successfully prosecute a violate of section 25401.  (*Id.* at 50-52.)  In *Salas*, the California Supreme Court applied *Simon* to section 25110 and similarly held that it is not a strict liability offense.  (*Id.* at

1   52.) *Salas* departed from the analysis in *Simon* in one significant way, however, as the court in Cole's

2   case explained:

> [¶] Whereas *Simon* held that knowledge of the falsity of a statement or the materiality of an omission (or criminal negligence) was an element of section 25401, which the prosecution was obligated to prove, in *Salas* the high court held guilty knowledge is not an element of section 25110.  Instead, it concluded that a defendant's reasonable good faith belief that a security is exempt from registration is an affirmative defense for which the defendant bears the initial burden of proof.  (*Salas*, *supra*, at p. 982.)

7   (*Id.* at 53.)

8   The appellate court in Cole's case then concluded that section 25210, of which Cole was

9   convicted, was "more analogous to section 25110 than it is to section 25401," and applied the reasoning

10   of *Salas* to its analysis of Cole's sufficiency of the evidence claim.   (*Id.* at 55.)  The court wrote:

> Accordingly, we conclude that "guilty knowledge" that a broker-dealer's licence was required is not an element of section 25210.  Rather, section 25210 is a general intent crime, and "no further mental state beyond willing commission of the act proscribed by law" is required. (*People v. Sargent* (1999) 19 Cal.4th 1206, 1215.) "In other words, it is sufficient for a conviction if the defendant intentionally did that which the law declares to be a crime."  (*In re Jerry R.* (1994) 29 Cal.App. 4th 1432, 1437-1438.)  But guilty knowledge is relevant as an affirmative defense and a nonlicensed broker-dealer who participates in a securities transaction in this state can affirmatively defend himself or herself on the basis of a reasonable and good faith belief that he or she is exempt from the licensing requirement of section 25210, and/or a reasonable and good faith belief that he or she is excluded from the statutory definition of a broker-dealer. (See § 25004.) [footnote 25 omitted.]  The defense bears the initial burden of proof on this issue, and if the defense presents enough evidence to raise a reasonable doubt that the defendant believed he or she was not exempt or not excluded from the licensing requirement of the statute, the court is required to instruct on this affirmative defense.

19   (*Id.* at 57-58.)

20   Applying this to Cole's case, the appellate court concluded there was sufficient evidence Cole

21   had the requisite "guilty knowledge" he was illegally selling securities without a broker-dealer license:

> Cole and Robles contend their convictions under section 25210 involving investments in Carlmont Capital and Alpha Telcom [counts eight, eleven and twenty-three] must be reversed because these transactions took place before it was legally determined that the transactions involved securities.  In essence, Cole and Robles argue they did not have knowledge that the investments they sold in Carlmont Capital and Alpha Telcom were securities transactions, and, therefore, they cannot be held criminally liable for selling these investments without a broker-dealer license.  The contention is without merit.
>
> As noted, section 25210 is a general intent crime.  Knowledge that an investment is a security (and therefore requires a broker-dealer license) is not an element of criminal violations of section 25210.  Although the prosecution must prove that the particular investment is a security as defined by statute (see § 25019), that is a question of fact for

the jury.  (*People v. Frederick* (2006) 142 Cal.App.4th 400, 413.)  Here, the jury was properly instructed on the definition of a security, and determined the investments were securities.  All that is required under section 25210 is that Cole and Robles intentionally committed the proscribed act — selling securities without a broker-dealer's license. Assuming arguendo that at the time Cole and Robles sold investments in Carlmont Capital and/or Alpha Telcom they had no license and did not know the investment they were selling was a security, all the elements of the crime would have been satisfied nonetheless.

To the extent the appellants are arguing that at the time they sold Carlmont Capital and/or Alpha Telcom there had been no legal determination the notes were securities, the argument fails.  The licensure requirement of section 25210 is designed to protect the unsophisticated investing public from unscrupulous and incompetent broker-dealers; among other things, to become a licensed broker-dealer, one must qualify by examination and meet financial responsibility requirements.  It would antithetical to the protective purpose of section 25210 if the statute came into play *only* when there has been a legal determination that an investment is a security.  If that were the case, there would be no protection for investors whose investments predated the legal determination by effectively giving the proscribed activity (selling securities without a license) immunity for their illegal conduct.

(*Id.* at 58-59.)

In assessing a sufficiency of the evidence claim, the Supreme Court has stated that "'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Juan H. v. Allen*, 408 F.3d 1262, 1275 (9th Cir. 2005) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).  In determining whether sufficient evidence has been presented, the Court must accept the elements of the crime as defined by state law.  *See Jackson*, 443 U.S. at 324, n.16; *Aponte v. Gomez*, 993 F.2d 705, 707 (9th Cir. 1993) (stating that federal courts are "bound by a state court's construction of its own penal statutes").

The state appellate court acknowledged the *Jackson* standard as the appropriate framework for its analysis, and it did not decide this case differently than *Jackson* on a set of materially indistinguishable facts.  (*See* Lodgment No. 2 at 43-44.)  Therefore, the state court's decision is not "contrary to" clearly established Supreme Court law.  *Williams*, 529 U.S. at 412-13.

Nor was the state court's denial an unreasonable application of *Jackson* and *Juan H.*  The California appellate court in Cole's case held, as a matter of state law and first impression, that knowledge an investment is a security is not an element of a violation of section 25210(a).  The jury was properly instructed that in order to convict Cole of the 25210(a) violation, they simply needed to find

he willfully offered or sold a security.[8]  (*See* Lodgment No. 1, vol. 2 at 0408.)  "Willfully" means a defendant intentionally did an act which violates the law.  (Lodgment No. 2 at 58; *Salas*, 37 Cal. 4th at 976.)

Given the state court's interpretation of section 25210, there was sufficient evidence presented for a rational jury to conclude that Cole willfully sold a security to Marion Goins (count eight), Lenora High (count 11) and Marjorie Maroun (count twenty-three).  Goins testified that Cole first contacted her about updating her trust and made an appointment to meet with her at her house.  (Lodgment No. 5, vol. 9 at 1131-32.)  He visited her about three times.  (*Id.* at 1132.)  On one of those occasions, he told Goins he could get a better return on her investments than she had been getting, with no risk.  (*Id.* at 1131-34.)  She eventually invested $102,000 in Carlmont Capital at Cole's urging.  (Lodgment No. 5, vol. 9 at 1135-37.)  Cole and Robles contacted Goins another time and sold her an investment in Alpha Telcom.  (*Id.* at 1140-42.)  Her daughter later convinced her to cancel that transaction.  (*Id.* at 1142.)  This evidence is sufficient for a rational jury to conclude that Cole wilfully sold a security to Goins.

Lenora High testified[9] that Cole came to her house to review and make changes in her living trust.  (Supp. Lodgment [Preliminary Hearing transcript], vol. 2 at 259.)  At this meeting, Cole told her about Alpha Telcom and urged her to invest in it.  (*Id.* at 260.)  After High told Cole she only had $5,000 to invest, Cole told High that the minimum investment was $10,000.  (*Id.*)  Eventually, High bought a $10,000 promissory noted in Alpha Telcom by taking $5,000 from her savings and borrowing $5,000 from her life insurance policy.  (*Id.* at 260-63.)  High received interest checks for about four months, then received a letter informing her that Alpha Telcom had filed for bankruptcy.  (*Id.* at 263.)  This is sufficient evidence from which a rational jury could conclude that Cole willfully sold High a security.

Finally, Marjorie Maroun testified[10] she first met Cole when he drew up a living trust for her.

---

[8]  In this claim, Cole only challenges the mental state needed to complete the crime of violating Corp. Code section 25210(a), not any other aspect of those convictions, such as the definition of "security."

[9]  Lenora High was found to be unavailable at trial.  Her preliminary hearing testimony was read into the record in lieu of live testimony.

[10]  Marjorie Maroun was also found to be unavailable at trial, and her preliminary hearing testimony was also read into the record in lieu of live testimony.

(*Id.* at 194.)  Maroun had trouble remembering many of the details of her interactions with Cole, as well as the investments she might have made with him.  She did recognize a document which reflected she purchased a $25,000 promissory note for Carlmont Capital Special Purpose Corporation II in March of 2000 in the name of "Marjorie Maroun Living Trust."  (*Id.* at 194-95.)   Cole told Maroun that she would  get a certain amount of money each month from the investment, but she could not remember the exact amount or what Carlmont Capital invested in.  (*Id.* at 195.)  She did not get her principal back from the Carlmont investment.  (*Id.* at 196.)  Although the prosecution presented documentary evidence that showed Maroun made an additional investment in Alpha Telcom, she could not remember anything about that transaction, nor could she identify the documents related to it.  (*Id.* at 196-99.)

The evidence supporting this count is not as clear as that supporting the counts involving Goins and High, owing mostly to the fact that Maroun could not recall much of the details of her transactions with Cole.  Given the high burden that Cole must overcome on federal habeas review, however, this Court cannot conclude that "no rational trier of fact" could have found Cole willfully sold a security to Maroun.  *See Juan H.*, 408 F.3d at 1274-75.

For all the foregoing reasons, the state court's denial of this claim is neither contrary to, nor an unreasonable application of, clearly established Supreme Court law.  *Williams*, 529 U.S. at 412-13.

> b. *Counts Two, Six, Sixteen, Twenty-One, Twenty-Seven, Thirty-One, Thirty-Five, Forty-Two, Forty-Six, Forty-Nine, and Fifty-Three (Corp. Code Section 25210(a) (Claim Three)*

Next, Cole claims there was insufficient evidence to support his convictions in the aforementioned counts for being a broker-dealer effecting a securities transaction without a certificate issued by the California Department of Corporations.  (Pet. at 10.)  Specifically, Cole contends there as not enough evidence to establish he was a "broker-dealer" within the meaning of the statute.  (*Id.*)  Respondent counters that the state court's adjudication of this claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law.  (Resp't Mem. P. & A. Supp. Answer at 32-34.)

Cole raised this claim in the petition for review he filed in the California Supreme Court, which denied the petition without citation of authority.  (Lodgment Nos. 3, 4.)  Thus, this Court must "look

through" to the California Appellate Court opinion as the basis for its analysis. *Ylst*, 501 U.S. at 803.

In his state court appeal, Cole challenged his convictions for counts two, six, sixteen, twenty-one, twenty-seven, thirty-one, thirty-five, forty-two, forty-six, forty-nine, and fifty-three on three grounds. First, he asserted there was insufficient evidence to show he knew the Carlmont Capital and Alpha Telcom products were securities. Second, he contended there was insufficient evidence to show he was a broker-dealer as defined by the Corporations Code section 25210. Third, he argued the jury was improperly instructed which deprived him of affirmative defenses. (Lodgment No. 2 at 47, Lodgment No. 3 at 23-36.) The state appellate court rejected all but one of Cole's arguments, finding there was sufficient evidence he was a broker-dealer, but concluding the jury was improperly instructed and reversing Cole's convictions with respect to the aforementioned counts. (*Id.* at 48-69.)

Thus, because the state court reversed the convictions Cole seeks to challenge here, albeit on grounds other than sufficiency of the evidence, he cannot challenge the state court's determination that there was sufficient evidence to show he was a broker dealer because he does not satisfy the "in custody" requirement as to those counts. It is a jurisdictional requirement that, at the time a habeas petition is filed, "the habeas petitioner be 'in custody' under the conviction or sentence under attack." *Maleng v. Cook*, 490 U.S. 488, 490-91 (1989) (citing 28 U.S.C. §§ 2241(c)(3) & 2254(a)); *see Carafas v. LaVallee*, 391 U.S. 234, 238 (1968)). The Ninth Circuit has stated as follows:

> The plain meaning of the text of § 2254(a) makes clear that physical custody alone is insufficient to confer jurisdiction. Section 2254(a)'s language permitting a habeas petition to be entertained "only on the ground that [the petitioner] is in custody *in violation of the Constitution or laws or treaties of the United States*," (emphasis added), explicitly requires a nexus between the petitioner's claim and the unlawful nature of the custody.

*Bailey v. Hill*, 599 F3d 976, 980 (2010).

Because Cole has not been convicted of the counts he seeks to challenge, federal habeas review is not available with regard to this claim. Accordingly, the Court lacks jurisdiction over this claim.

c.  *Counts Twenty-Five, Twenty-Eight and Twenty-Nine (Penal Code Section 368(d) and 459/460) (Claim Four)*

Cole next argues there was insufficient evidence to support his convictions for elder theft and burglary in counts twenty-five, twenty-eight and twenty-nine because the prosecution did not establish

1   he had the intent to permanently deprive the owners of their property or that he entered the residences

2   of the victims with intent to commit theft.  (*Id.* at 12.)  Respondent contends the state court's resolution

3   of this claim was neither contrary to, nor an unreasonable application of, clearly established Supreme

4   Court law.  (Resp'ts Mem. P. & A. Supp. Pet. at 39-39.)

5          Cole raised this claim in the petition for review he filed in the California Supreme Court, which

6   denied the petition without citation of authority.  (Lodgment Nos. 3, 4.)  This Court must therefore look

7   through to the state appellate court's opinion denying this claim as the basis for its analysis.  *Ylst*, 501

8   U.S. at 803.  With regard to the burglary conviction (count 28), that court wrote:

> Burglary is defined by statute as the entry of a building "with intent to commit
> grand or petit larceny or any felony."  (Pen. Code, § 459.)  Thus, the two elements of
> entry and felonious intent are not only necessary, but sufficient to complete the crime of
> burglary, whether or not the intended felony is actually committed.  (*People v. Montoya*
> (1994) 7 Cal.4th 1027, 1041-1042.)  The burglary or entry is a means of facilitating the
> commission of the theft or felony.  (*People v. Kwok* (1998) 63 Cal.App.4th 1236, 1248.)
> The defendant's intent to commit the crime must exist at the time of entering the
> building.  (*People v. Hill* (1967) 67 Cal.2d 105, 119.)
>
> For property to be stolen or obtained by theft it must be taken with a specific
> intent — namely, "the intent to permanently deprive the owner of possession of the
> property."  (*People v. Avery* (2002) 27 Cal.4th 49, 54, italics omitted.)  The taking of the
> property of another is not theft absent this intent.  (*People v. Butler* (1967) 65 Cal.2d
> 569,
> 573, overruled on another point in *People v. Tufunga* (1999) 21 Cal.4th 925, 939.)  The
> specific intent with which an act is performed is a question of fact.  (*People v.
> Kranhouse* (1968) 265 Cal.App.2d 440, 449.)  "Because intent is rarely susceptible of
> direct proof, it may be inferred from all the facts and circumstances disclosed by the
> evidence.  [Citations.]  Whether the entry was accompanied by the requisite intent is a
> question of fact for the [fact finder].  [Citation.]  'Where the facts and circumstances of
> a particular case and the conduct of the defendant reasonably indicate his purpose in
> entering the premises is to commit larceny, or any felony, the conviction may not be
> disturbed on appeal.'"  (*People v. Kwok*, *supra*, 63 Cal.App.4th at p. 1245.)
>
> "'In reviewing the sufficiency of evidence . . . , the question we ask is "whether,
> after viewing the evidence in the light most favorable to the prosecution, any rational
> trier of fact could have found the essential elements of the crime beyond a reasonable
> doubt."'"  (*People v. Young* (2005) 34 Cal.4th 1149, 1175, italics omitted.)  As an
> appellate court, we "'must view the evidence in a light most favorable to respondent and
> presume in support of the judgement the existence of every fact the trier could
> reasonably deduce from the evidence.'"  (*People v. Johnson* (1980) 26 Cal.3d 557, 576.)
> "This standard applies whether direct or circumstantial evidence is involved."  (*People
> v. Catlin* (2001) 26 Cal.4th 81, 139.)
>
> If the verdict is supported by substantial evidence — that is, evidence which is
> reasonable, credible, and of solid value — we accord due deference to the verdict and
> will not substitute our evaluations of the witnesses' credibility for that of the trier of fact.
> (*People v. Koontz* (2002) 27 Cal.4th 1041, 1078.)  A conviction will not be reversed for
> insufficient evidence unless it appears "that upon no hypothesis whatever is there
> sufficient substantial evidence to support" the conviction."  (*People v. Redmond* (1969)

71 Cal.2d 745, 755.)

On this record, we find substantial evidence that Cole committed residential burglary by entering Petersen's residence and taking the $100,000 cashier's check with the specific intent to steal Petersen's money — that is, with the intent to permanently deprive Petersen of her property.

In July 2002, when Cole solicited Petersen's investment in Faith Holdings, Cole's business was on the brink of financial disaster. Faith Holdings had no investments. Over the past seven months interest payments owed by Coles' business to earlier investors — Leginus, Quintero, Correia, the Petersons, the Roemmichs and Labruzzi — had stopped. Cole was unable to return the principal owed to Flory and Quintero as their investments matured and became due. Despite this dismal record, Cole was running newspaper advertisements promising 10 percent return on investments that were "<u>TOTALLY PROTECTED</u> from the day to day stock market volatility."

Moreover, by this time, the DOC had issued Cole a cease and desist order to stop selling securities. Cole had used the money invested by Nichols, who was a recent investor, in Cole's other company, Investment Revolution Strategies, for consumer purchases and expenses rather than putting the money in a viable investment.

A jury reasonably could deduce that Cole, who was in financial straits and had used money from a recent investor for personal expenses instead of investing it, was intending to take and permanently deprive Petersen of her money, or at least some portion of it, when he entered her residence and left with her cashier's check for $100,000 on July 30, 2002. This specific intent to commit theft is further bolstered by Cole's actions after Petersen's $100,000 investment was deposited in a Bank of America account and subsequently frozen by court order. In a letter dated August 13, 2002, Cole requested the freeze be lifted because the money was needed for "critical corporate operations; office rent, advertising and licensing." The jury reasonably could find that Cole did not intend to invest Petersen's money; he planned to use the money as if it were his own to extricate himself from the financial crisis he had put himself in.

Cole points to contradictory evidence, presented through business associate David Svec, that Cole was intending to invest Petersen's money in a company whose business was to install credit card machines in retail stores. The jury was free to reject the defense theory that Cole intended to invest Petersen's money in a legitimate business. "It is the exclusive function of the trier of fact to assess the credibility of witnesses and draw reasonable inferences from the evidence." (*People v. Sanchez* (2003) 113 Cal.App.4th 325, 330.)

(Lodgment No. 2 at 42-45.)

The state appellate court also upheld Cole's elder abuse convictions (counts twenty-five and twenty-nine), finding sufficient evidence to support them as well:

A person commits elder abuse by theft when he or she takes property worth more than $400 from a person whom he or she knows or reasonably should have known is at least 65 years old the with the specific intent to permanently deprive the elderly person of his or her property. (Pen. Code § 368, subds. (d), (g); *People v. Avery, supra,* 27 Cal.4th at p. 54.)

As explained in Part III, *ante,* there was substantial evidence that Cole had the

1   specific intent to permanently deprive Petersen of her money.

2
3   Similarly, there was substantial evidence that Cole had the specific intent to permanently deprive Nichols of her money.

4   On April 23, 2002, Nichols invested $25,000 in Investment Revolution
5   Strategies. Cole told Nichols he would invest the money for her. The next day Nichols's check and another $5,000 check were deposited in the Investment Revolution Strategies
6   bank account. The previous account balance was $110. Subsequently, numerous disbursements from this account were made; none of them involved an investment. A
7   forensic accountant testified that $8,458 was disbursed for credit card purchases, including $1,316 to a BMW dealer. Another $20,000 was disbursed from the account on May 7, but the forensic accountant could not determine what that money was used
8   for.

9   As with Petersen, it was significant that at around this time, Cole's business
10   affairs had begun to unravel. Interest payments due to Leginus, Lovins, Correia had stopped. A jury could reasonably infer that Cole intended to use Nichols's money for his own purposes and not to make a legitimate investment for her.

11

12   (*Id.* at 46-47.)

13   The state court's denial of these claims was neither contrary to, nor an unreasonable application

14   of, clearly established Supreme Court law. *Williams*, 529 U.S. 412-13. As discussed above, and as

15   properly noted by the state appellate court, in assessing a sufficiency of the evidence claim, "'the

16   relevant question is whether, after viewing the evidence in the light most favorable to the prosecution,

17   any rational trier of fact could have found the essential elements of the crime beyond a reasonable

18   doubt.'" *Juan H.*, 408 F.3d at 1275; *see also* Lodgment No. 2 at 43. This Court must accept the

19   elements of the crime as defined by state law. *Jackson*, 443 U.S. at 324, n.16; *Aponte*, 993 F.2d at 707.

20

21   The state appellate court correctly set forth the elements of the crime of burglary and elder theft

22   in California. "Every person who enters any house . . . with intent to commit grand or petit larceny

23   [theft] or any felony is guilty of burglary." Cal. Penal Code § 459. The intent element of burglary may

24   be inferred from the facts and circumstances surrounding the case. *In re Matthew A.*, 165 Cal. App. 4th

25   537, 540-41 (2008). The theft or felony need not be accomplished for the crime to be completed.

26   *People v. Montoya*, 7 Cal. 4th 1027, 1041-42 (1994).

27   Given these elements, the record amply supports the state court's conclusion that the facts and

28   circumstances surrounding Cole's entry into Carol Petersen's house, as charged in count twenty-eight,

1   establish he entered with the intent to steal her money.  Petersen testified she made an appointment with

2   Cole after she saw one of his advertisements about investment opportunities in the newspaper in July

3   of 2002.  (Lodgment No. 5, vol. 14 at 2276-79.)  Cole came to her house and discussed several

4   investment opportunities with her, including a "mom and pop trucking company," a "rest home in

5   Florida," and "some sort of card that you would swipe in a machine going to the supermarket."  (*Id.* at

6   2280.)  Cole tole Petersen she would receive a ten percent return on her investment, and Petersen gave

7   Cole a $100,000 check.  (*Id.* at 2281.)  In return, Cole gave her a promissory note for Faith Holdings.

8   (*Id.* at 2292.)

9           As the state court pointed out, by the time Cole sold Petersen the Faith Holdings promissory

10   note, Lisa Leginus, George Quintero, Ethel Correia, Donald and Carol Peterson, Henry Roemmich, and

11   Helen Labruzzi had all been told by Cole that the investments he offered were low risk but with very

12   high returns, all had invested substantial amounts of money in Pathway Strategies, all had stopped

13   receiving interest checks and all had been told by Cole and/or Robles that the money they had invested

14   was gone.  (Lodgment No. 5, vol. 10 at 1384-1412 [testimony of Labruzzi]; vol. 11 at 1472-91

15   [testimony of Correia]; vol. 12 at 1756-770 [testimony of Leginus]; vol 13 at 2137-58 [testimony of

16   Quintero]; vol. 13 at 1975-90, 2001-28 [testimony of Carol Peterson]; vol. 15 at 2594-2604 [testimony

17   of Roemmich].)  Contrary to Cole's assertions, investors' money was put into high risk ventures and at

18   least some of the money was used for personal expenses.  (Lodgment No. 5, vol. 1565-92 [testimony

19   of forensic accountant April Riel]; 1593-1615 [testimony of Carl Moore].)  Thus, viewing the evidence

20   in  the light most favorable to the prosecution, a reasonable jury could have concluded Cole was

21   involved in an ongoing scheme to defraud elderly people of their money, and that Cole entered

22   Petersen's home with the intent to permanently deprive her of her money.  *See Juan H.*, 408 F.3d at

23   1275.  Although Cole presented evidence that he had invested the money in actual businesses but the

24   investments had failed due to the events of September 11, 2001, the jury was free to disregard that

25   evidence and instead find that he was guilty of burglary.

26           The state court's conclusion that there was sufficient evidence to support Cole's conviction for

27   elder abuse by theft (counts twenty-five and twenty-nine) is also supported by the record.  A person is

28   guilty of theft from an elder if he or she commits a theft against a person who he or she knows or

reasonably should have known was sixty-five years or older.  Cal. Penal Code § 368.  "Theft," requires the intent to permanently deprive an owner of his or her property.  *People v. Avery*, 27 Cal. 4th 49, 54 (2002).  Petersen was the victim named in county twenty-five, and, as discussed above, there was sufficient evidence that Cole intended to permanently deprive her of her money.  (*See* Report and Recommendation at Part IV(B)(2)(c).)  Count twenty-nine involved Mair Nichols.  She gave a total of $125,000 to Cole to invest in Pathway Strategies and Investment Revolution Strategies.  (Lodgment No. 5, vol. 13 at 2199-2220; vol. 14 at 2221-40.)  Like the other investments sold by Cole, Nichols was told there was little to no risk to her money but that she would be getting ten percent interest.  (Lodgment No. 5, vol. 14 at 2238-39.)  Nichols invested $25,000 in Investment Revolution Strategies and $100,000 in Pathway Strategies.  (*Id.* at 2234-37.)  As the state court noted, around this time, Cole's other investors in Pathway had not received their interest checks and were eventually told their money was gone.  (Lodgment No. 5, vol. 10 at 1384-1412 [testimony of Labruzzi]; vol. 11 at 1472-91 [testimony of Correia]; vol. 12 at 1756-770 [testimony of Leginus]; vol 13 at 2137-58 [testimony of Quintero];; vol 13 at 1975-90, 2001-28 [testimony of Carol Peterson]; vol. 15 at 2594-2604 [testimony of Roemmich].)  Some of the money from the Investment Revolution Strategies Account was spent on meals, merchandise, and payments on a BMW car.  (Lodgment No. 5, vol. 11 at 1586.)  In addition, $20,000 was withdrawn in Las Vegas for unknown purposes.  (*Id.*)  As with the preceding claim, and viewing the evidence in the light most favorable to the prosecution, a reasonable jury could have concluded that Cole was operating a scam designed to steal elderly people's money, and reject the defense contention that it was simply a case of investments gone bad due to a market crash.  *See Juan H.*, 408 F.3d at 1275.

For all the foregoing reasons, the state court's denial of this claim is neither contrary to, nor an unreasonable application of, clearly established Supreme Court law.  *Williams*, 529 U.S. at 412-13.  Cole is not entitled to relief as to this claim.

> d.    *Counts One, Ten, Fifteen, Twenty, Thirty, Forty-One, Forty-Five*
> *and Fifty-Two (Corp. Code 25401) (Claim Five)*

Finally, Cole alleges there was insufficient evidence to support his convictions for violations of Corporations Code 25401 in counts one, ten, fifteen, twenty, thirty, forty-one, forty-five and fifty two because the prosecution failed to show he knowingly made false statements or omissions in the course

of selling a security. (Pet. at 14.) Respondent argues the state court's denial of this claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law. (Mem. P. & A. Supp. Answer at 39-48.)

Cole raised this claim in the petition for review he filed in the California Supreme Court, which denied the claim without citation of authority. (Lodgment Nos. 3, 4.) Thus, this Court must "look through" to the state appellate court opinion as the basis for its analysis. *Ylst*, 501 U.S. at 801-02. That court reversed Cole's convictions on counts seven (Marion Goins) and count twenty-two (Marjorie Maroun), finding that substantial evidence did not exist to support those convictions. (Lodgment No. 2 at 71-72, 81.) As to the remaining counts, the court made the following factual and legal findings:

>    *Count 1 (The DaSilveiras)*
>
>    In 2002, Cole contacted the DaSilveiras, who had invested in Carlmont Capital in 2000, about investing money in Faith Holdings for a 10 percent return. Cole said the investment involved a company manufacturing credit card machines and there was low or no risk. On July 2, the DaSilveiras invested $104,000 — their life savings — in Faith Holdings. The DaSilveiras believed the entire amount was to be invested in this credit card machine company and did not give Cole permission to do anything else with the money.
>
>    Substantial evidence supported Cole's conviction of selling securities to the DaSilveiras by means of false statements or material omissions on this count. By mid-2002, Cole's businesses were in dire financial straits, other investors had not received interest payments owed to them for as long as 10 months, and Faith Holdings had no investments. Under these circumstances, a jury could reasonably conclude that telling the DaSilveiras that they were making a low -or no-risk investment of their life savings was a material misrepresentation, as was the promise of a 10 percent return.
>
>    Cole's reliance on the testimony of Svec, the business consultant who was trying to arrange a deal between Faith Holdings and RGJ Merchant Services, a company that placed point-of-sales terminal in retail stores, is unavailing. First, the deal had not materialized. Second, the jury was entitled to reject Svec's testimony and conclude he offered nothing but speculation as to how successful the deal would be and whether it would generate enough money to pay Faith Holdings investors a 10 percent return.
>
>    *Count 30 (Petersen)*
>
>    We apply the same analysis to count 30 involving Petersen that we applied to count 1. Petersen invested in Faith Holdings within days of the DaSilveiras. The dismal state of Cole's businesses was the same when Petersen made her investment as it had been when the DaSilveiras made their investment. Both the DaSilveiras and Petersen responded to a newspaper advertisement for Faith Holdings promising 10 percent returns on investments that were "TOTALLY PROTECTED." Although the record does not indicate that Cole verbally told Petersen there was little or no risk, the jury could reasonably believe Petersen relied on the advertisements's misrepresentation that the investment was "TOTALLY PROTECTED." Substantial evidence supported the jury's verdict that Cole knowingly misrepresented material facts in selling securities to Petersen.

. . . .

/ / /

### Count 10 (High)

In 2000, Cole and Robles went to High's residence and suggested she invest in Alpha Telcom. Cole and Robles told High that they had invested $500,000 of their own money in Alpha Telcom; however, High testified she did not believe this. At their urging, High borrowed an additional $5000 from her insurance policy to make the minimum allowable investment in Alpha Telcom. Cole and Robles did not tell High this was a high risk investment or that they were not licensed. At one point, High telephoned Cole to get her money back. Cole told her that she would not be able to get her principal back for 10 years. After four months, High stopped receiving her interest payments. Subsequently, Cole and Robles wrote High a letter stating Alpha Telcom had filed for bankruptcy.

Substantial evidence supported the jury's verdict that Cole and Robles were guilty of violating section 25401. They knowingly misrepresented that they had invested $500,000 in Alpha Telcom. Cole claims the prosecutor did not prove that Cole and Robles did not invest $500,000 of their own money in Alpha Telcom. We disagree. Given the totality of the evidence, the jury reasonably could infer that neither Cole nor Robles, individually or collectively, had $500,000 of their own money to make such an investment.

Cole and Robles's alternative argument is that because High did not believe they had made the $500,000 investment, the misrepresentation was not material. But when Cole and Robles made this misrepresentation they did not know that High would be skeptical of its veracity. A jury could reasonably conclude that Cole and Robles believed that by falsely telling High they had invested $500,000 in Alpha Telcom they were making a material misrepresentation — that is, it would increase the chances that a reasonable person in High's situation would invest in the company.

Further, there is no doubt that Cole and Robles's failure to disclose this was a high-risk investment was a material omission. High, at age 77, was an elderly person who had only $5,000 to invest and had to borrow an additional $5,000 from her insurance policy. At the very least, Cole and Robles were criminally negligent for not determining the risks involved with investing in a company that would no longer be making promised interest payments within four months and shortly thereafter file for bankruptcy.

### Count 15 (Leginus)

In February 2001, Leginus invested $30,000 in a Pathway Strategies promissory note after Cole and Robles told her Pathway Strategies would invest her money in Alpha Telcom. At first, Leginus was skeptical. When Leginus told Cole and Robles that she could not afford to lose her money, Cole reassured Leginus that her money was secure. Cole and Robles said they had investigated Alpha Telcom, there was an insurance policy on money invested with the company, and she would not lose her money. Cole told Leginus that his grandparents had invested in Alpha Telcom. Neither Cole nor Robles told Leginus that they were not licensed to sell securities in California. After Leginus received interest payments for more than a year, Robles told her that he and Cole were splitting up as partners and her funds were frozen. Robles also told Leginus they had not invested in the telephones but did not tell her what they had done with her money. Leginus testified that if Cole and Robles had disclosed their unlicensed status, she would

not have given them her "hard-earned money."

Substantial evidence supports the jury's verdicts. First, Cole and Robles falsely told Leginus that her $30,000 would be invested in Alpha Telcom; none of her money was invested in the company. Second, Cole and Robles omitted telling Leginus that they were not licensed to sell securities in California. This was a material omission as Leginus, who had some skepticism about investing, testified that had she known Cole and Robles were not licensed she would not have invested with them. Third, Cole and Robles, at the very least, misrepresented the thoroughness of their investigation; in 2000, some states had issued cease and desist orders to Alpha Telcom. Notwithstanding Cole's argument that there was no proof that his grandparents did not invest in Alpha Telcom, the jury reasonably could have concluded this representation was not true. Convincing Leginus to make the investment had not been easy, and a rational jury could infer that Cole's statement about his grandparents was an attempt to eliminate Leginus's doubts and convince her that the investment was secure.

*Count 20 (Lovins)*

In May 2001, Lovins invested $20,000 in a 38-month promissory note with Pathway Strategies at 12 percent interest with the understanding it would be invested in Alpha Telcom. Cole told Lovins that he had never missed a payment on a note before, the telephone company was strong, and the investment was "foolproof." Neither Cole nor Robles disclosed that they were not licensed to sell securities in California. Lovins testified that had he known they were unlicensed he would have thought harder about whether to invest with them. Bank records showed that Cole and Robles invested Lovins's money in Alpha Telcom.

Substantial evidence supports Cole's and Robles's convictions of selling securities to Lovins by means of misrepresentations or material omissions. In essence, Cole's statement that Lovins's investment was "foolproof" was equivalent to saying it was a no-risk or low-risk investment. As such, the statement constituted a misrepresentation; in mid-2001, Alpha Telcom was doing poorly financially and several states had issued cease and desist order for Alpha Telcom. Further, Cole and Robles's failure to disclose that they were not licensed to sell securities in California was a material omission in light of Lovins's statement that he would have thought "harder" about investing with them had he known about their lack of licenses.

Cole and Robles point out that Lovins signed a disclaimer acknowledging there was no guarantee for the investment and the need for prudence. Lovins testified that he did not read the disclaimer closely and believed the provision concerned the distinction between Pathway Securities and Pathway Financial. This evidence was before the jury, which was free to give the disclaimer and Lovins's testimony whatever weight it deemed appropriate. Lovins testified he presumed Pathway Financial was affiliated with large insurance companies and there was a strong company. The jury reasonably could have concluded that Lovins's presumption that his investment in Pathway Strategies was safe would have been affected had Cole and Robles disclosed that they were not licensed.

. . . .

*Count 41 (Correia)*

In November 2000, Cole and Robles went to Correia's home and suggested she move her $160,000 investment in Carlmont Capital to Alpha Telcom. Cole told Correia that there was no risk involved in investing in Alpha Telcom and the investment would be guaranteed by Lloyds of London. Cole also told Correia that his grandfather had

invested $1 million in Alpha Telcom.  In April 2001, Correia invested $160,000 in a Pathway Strategies promissory note.  Correia believed her money would be invested in Alpha Telcom, but Robles told her afterward that her money had not been invested in Alpha Telcom.  Correia testified she would not have invested in Pathway Strategies had she known it was a risky investment.

Substantial evidence supports Cole's conviction for violating section 25401 in selling securities to Correia.  Cole made material misrepresentations in telling Correia that the investment carried no risk and that his grandfather had invested $1 million in Alpha Telcom.  Correia testified that she would not have invested her money if she had known it was risky.  Correia also testified that Cole's representation about his grandfather's investment was a factor in her decision to invest.  As in the case of count 15 involving Leginus, we are unpersuaded by Cole's argument that there was no proof that his grandparents did not invest in Alpha Telcom.  The jury reasonably could conclude this representation was not true, especially in light of the fact that Cole told some investors his grandfather had invested $1 million and to others he said the amount was $500,000.

. . . .

*Count 45 (the Roemmichs)*

In February 2001, the Roemmichs invested $60,000 in a Pathways Strategies promissory note.  Cole and Robles told the Roemmichs that they had been in business for 14 years and had never missed a payment.  Neither Cole nor Robles disclosed that he did not have a license to sell securities in California.  Roemmich testified that had he known Cole and Robles were unlicensed, he would not have invested with them.

Substantial evidence supports Cole's and Robles's convictions of violating section 25401 in selling securities to the Roemmichs by means of misrepresentations and/or material omissions.  The failure to disclose their unlicensed status was a material omission to the Roemmichs.  Further, the evidence contradicted Cole and Robles's claim that they had never missed a payment; the jury reasonably could have concluded this was a misrepresentation.

*Count 52 (Labruzzi)*

In September 2001, Labruzzi invested $100,000 in Alpha Telcom.  Robles signed the agreement as Alpha Telcom's representative.  The following month, Labruzzi, after taking out a reverse mortgage on her house, invested $124,000 in a Pathway Strategies promissory note with the understanding her money would be invested.  Cole and Robles did not discuss with Labruzzi any risk in making these investments.  Neither Cole nor Robles disclosed they were not licensed to sell securities in California.  Labruzzi testified that if they had told her that they were unlicensed, she would have "investigated."  Of the $124,000 that Labruzzi invested in Pathway Strategies, $99,000 went into the company's payroll account.

Substantial evidence supported Cole's and Robles's convictions of violating section 25401 in selling securities to Labruzzi.  Cole and Robles did not invest Labruzzi's money as they stated they would.  Cole and Robles did not discuss risk, which was a material omission.  Their failure to disclose their unlicensed status also was a material omission to Labruzzi.

Cole and Robles argue there was no evidence that they knew of any of the risks involved in Labruzzi's investments.  We are unpersuaded.  Alpha Telcom filed for bankruptcy in August 2001 and they were touting Alpha Telcom as a sound investment

1    in September.  Moreover, by October 2001, Pathway Strategies was investing in high-
2    risk ventures such as Tierra Telecom and NatureWell.  Given these circumstances, the
     failure to discuss risk with Labruzzi was a material omission.

3    (Lodgment No. 2 at 69-86.)

4        The state court conducted a thorough analysis of the evidence supporting Cole's convictions for

5    violations of Corporations Code section 25401, and its conclusion that substantial evidence supported

6    those convictions is neither contrary to, nor an unreasonable application of, clearly established Supreme

7    Court law.  *Williams*, 529 U.S. at 412-13.  Section 25401 states as follows:

8            It is unlawful for any person to offer or sell a security in this state or buy or offer
     to buy a security in this state by means of any written or oral communication which
9    includes an untrue statement of a material fact or omits to state a material fact necessary
     in order to make the statements made, in the light of the circumstances under which they
10   were made, not misleading.

11   (Corp. Code § 25401) (West. 2006).

12       As previously discussed, the California Supreme Court held in *Simon* that a violation of section

13   25401 requires "knowledge of the falsity or misleading nature of a statement or of the materiality of an

14   omissions, or criminal negligence in failing to investigate and discover them."  *Simon*, 9 Cal. 4th at 522.

15   "A fact is material if there is a substantial likelihood that, under all the circumstances, a reasonable

16   investor would consider it important in reaching an investment decision."  *Insurance Underwriters*

17   *Clearing House, Inc. v. Natomas Co.*, 184 Cal. App. 3d 1520, 1527 (1986).

18       Applying California law consistent with *Jackson* and *Juan H.*, the state court correctly found the

19   victims' testimony supported the counts of which Cole was convicted.  Elvira DaSilveira testified Cole

20   sold her a $104,000 promissory note in Faith Holdings in July of 2002.  (Lodgment No. 5, vol. 10 at

21   1269.)  This represented all of her life savings.  (*Id.* at 1265.)  Cole told DaSilveira she would get a ten

22   percent return on her money and that the investment carried little or no risk to her capital.  (Lodgment

23   No. 5, vol. 10 at 1265-68.)  Cole said this despite the fact that at the time he sold DaSilveira the note,

24   Faith Holdings had no investments and had only $4600 cash in the account.  (*Id.* at 1264; Lodgment No.

25   5, vol. 11 at 1579.)  Cole also told DaSilveira that Faith Holdings would invest the money in "point of

26   sale" machines in retail stores; however, at the time the note was sold, the deal had not yet been

27   finalized.  (Lodgment No. 5, vol.11 at 2184-86.)  Moreover, as the state court pointed out, Cole's other

28   investments were failing and he was unable to pay interest payments to his other victims.  (Lodgment

No. 5, vol. 11 at 1476-89 [testimony of Ethel Correia; vol. 12 at 1762-69 [testimony of Lisa Leginus], 1839-47 [testimony of Albert Flory], 1922–34 [testimony of Ray Lovins]; vol. 13 at 1983-90, 2002-06 [testimony of Carol Peterson], 2145–54 [testimony of George Quintero]; vol. 13 at 2211-20, vol. 14 at 2227-40 [testimony of Mair Nichols]; vol. 15 at 2598-2601 [testimony of Henry Roemmich].) A rational jury could conclude that Cole's representations were materially misleading. A reasonable investor would consider the precariousness of Cole's financial situation an important factor in deciding whether to entrust their life savings to him.

Similarly, Elizabeth Petersen testified Cole sold her two $100,000 promissory notes for Faith Holdings which would pay ten percent interest in July of 2002 when his finances were in shambles. (Lodgment No. 5, vol. 14 at 2281.) She later found out Cole had lost his brokerage license, which prompted her to contact police and set up a "sting" of Cole. (*Id.* at 2285-93.) Cole did not discuss with Petersen how risky the investment in Faith Holdings was. (*Id.* at 2293.) A rational jury could conclude Cole's failure to disclose the dire straits his finances were in, as well as his lack of a brokerage license, as materially misleading because a reasonable investor would consider these important factors in deciding whether to invest such a large amount of money with an individual.

Lenora High testified she invested $10,000 in Alpha Telcom at the urging of Cole and Robles who told her they had invested $500,000 of their own money in the venture. (Supp. Lodgment [Preliminary Hearing Transcript] at 262-64.) As the state court noted, although there was no direct proof that either Cole or Robles had not invested such funds in Alpha Telcom, the jury could so infer on the basis of the information about Cole's finances that they did not have the funds to do so. In addition, a rational jury could conclude that Cole's representation about his own investment was materially misleading because a reasonable investor would consider it an important factor in deciding whether to entrust their money with him.

Lisa Leginus testified Cole suggested she invest in Pathway Financial. According to Leginus, Cole was frustrated by her initial caution and pressed her to invest with him. (Lodgment No. 5, vol. 12 at 1759-61.) Leginus told Cole she could not lose the money she was investing with him. (*Id.* at 1763-64.) In response, Cole told her the investment she was making in Pathway Financial was insured, and that his grandparents had invested in the company. (*Id.* at 1759-60.) Cole did not disclose he was not

a licensed broker-dealer, and Leginus testified she would not have invested her money with him had she known that fact. (*Id.* at 1770.) As it turned out, Pathway Financial was not insured and Leginus did not get her principal back. (*Id.* at 1768.) A rational jury could conclude Cole's statement to the contrary was a material misrepresentation and his failure to disclose his lack of licensure a material omission. A reasonable investor would consider these to be important factors in deciding whether to invest with Cole.

Ray Lovins testified that when Cole was trying to convince him to invest with him in May of 2001, Cole said his company was very strong, they had "never been bad on a note before" and the investment was "foolproof." (Lodgment No. 5, vol. 12 at 1922, 1936.) Cole told him they would invest the money in a telephone company. (*Id.* at 1929.) Cole did not tell him he was not licenced to sell securities. (*Id.* at 1935.) In fact, Cole was served with two cease and desist orders from the California Department of Corporations in 2001. (Lodgment No. 5, vol. 15 at 2510-12.) Moreover, Alpha Telcom filed for bankruptcy in August of 2001, just three months after Cole sold Lovins the promissory note. (*Id.* at 2555.) A rational jury could conclude that Cole's representation regarding the "foolproof" nature of the investment was material because a reasonable investor would consider this to be an important factor in deciding whether to invest with Cole. In addition, a rational jury could find that Cole's failure to disclose that Alpha Telcom was in financial difficulty, or to perform sufficient investigation to learn this fact, was a either a material omission or criminally negligent. *See Simon*, 9 Cal. 4th at 522.

Ethel Correia testified Cole sold her a $160,000 promissory note for Alpha Telcom in November of 2000. (Lodgment No. 5, vol. 11 at 1480-85.) Cole told Correia there was no risk in this investment and that his grandfather had invested $1,000,000 in Alpha Telcom; this persuaded Correia to invest in Alpha Telcom. (Lodgment No. 5, vol. 10 at 1467-68, vol. 11 at 1472.) A rational jury could conclude these were material misrepresentations. Alpha Telcom filed for bankruptcy less than a year after Cole sold Correia the investment. (Lodgment No. 5, vol. 15 at 2555.) A reasonable investor would have considered Alpha Telcom's desperate financial situation as an important factor when deciding to invest over $100,000, and Cole either knew about or was criminally negligent in failing to discover Alpha Telcom's financial condition. *See Simon*, 9 Cal. 4th at 522. In addition, the jury could reasonably conclude from all the evidence presented that Cole's grandfather did not invest $1,000,000 in Alpha

1   Telcom and that Cole simply lied about this as an inducement to get Correia to invest.

2       Henry Roemmich testified Cole sold him a $60,000 promissory note in Pathway Strategies in

3   February of 2001. (Lodgment No. 5, vol. 15 at 1598-99.) Cole told Roemmich that he had never missed

4   a payment but did not tell him he was not a licensed broker-dealer. (*Id.* at 2600-01, 2603.) Roemmich

5   testified that if he had known Cole did not have a license, he would not have invested his money with

6   him. (*Id.* at 2603.) A rational jury could conclude that Cole's failure to disclose his lack of licensure

7   was a material omission. Not only would a reasonable investor consider this to be an important factor

8   when deciding to invest, but Roemmich himself stated that he would not have invested with Cole if he

9   had known he did not have a license.

10      Finally, Helen Labruzzi testified she invested $100,00 in Alpha Telcom and $124,000 in

11  Pathway Strategies at Cole's urging. (Lodgment No. 5, vol. 10 at 1404-05.) The Alpha Telcom

12  investment was made in September of 2001. (Lodgment No. 2 at 85.) Cole did not discuss with

13  Labruzzi what level of risk the investments carried. (Lodgment No. 5, vol. 10 at 1409.) A rational jury

14  could conclude the failure to discuss risk with Labruzzi was a material omission. Alpha Telcom

15  declared bankruptcy in August of 2001, a month before Cole sold the $10,000 investment in the

16  company to Labruzzi. Labruzzi was eighty-five years old at the time she met Cole and was in need of

17  income. A reasonable investor in this position would consider the information about Alpha Telcom an

18  important factor in deciding whether to invest.

19      For all the foregoing reasons, the state court's conclusion that substantial evidence supported

20  Cole's convictions was neither contrary to, nor an unreasonable application of, clearly established

21  Supreme Court law. *Williams*, 529 U.S. at 412-13. Cole is not entitled to relief as to this claim.

22  **V. CONCLUSION**

23      Based on the foregoing reasons, the undersigned Magistrate Judge **RECOMMENDS** the

24  Petition for Writ of Habeas Corpus be **DENIED**. This report and recommendation is submitted to Chief

25  Judge Irma E. Gonzalez assigned to this case pursuant to 28 U.S.C. § 636(b)(1).

26      **IT IS ORDERED** that no later than **November 16, 2010**, any party to this action may file

27  written objections with the Court and serve a copy on all parties. The document should be captioned

28  "Objections to Report and Recommendation."

**IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the Court and served on all parties no later than **November 30, 2010**.  The parties are advised that failure to file objections within the specified time may waive the right to raise those objections on appeal of the Court's order.  *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

**IT IS SO ORDERED**.

DATED:  October 21, 2010

_____
LOUISA S PORTER
United States Magistrate Judge